[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13611

_____

D.C. Docket No. 1:16-cv-20121-DPG

JPAY, INC.,

Plaintiff - Appellee,

versus

CYNTHIA KOBEL,
SHALANDA HOUSTON,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 19, 2018)

Before MARCUS and WILSON, Circuit Judges, and GRAHAM,[*] District Judge.

MARCUS, Circuit Judge:

At issue today is a question at the intersection of arbitration and class action jurisprudence, a question that has been expressly left open by the Supreme Court and which comes to this Circuit as a matter of first impression. The parties agree that their disputes will be settled in arbitration, but disagree as to whether that arbitration can proceed on a class basis. Further, they disagree about who -- a court or an arbitrator -- should decide whether the arbitration can proceed on a class basis. We must decide as a matter of first impression whether the availability of a class is a "question of arbitrability" that presumptively goes to a court. If we hold that it is -- and we do so today -- we must then decide whether the terms of the parties' agreement evince a clear and unmistakable intent to overcome that presumption.

Cynthia Kobel and Shalanda Houston sought to compel arbitration on a class basis with JPay, Inc., a Miami-based company that provides fee-for-service amenities in prisons in more than thirty states. JPay asked a district court to put a stop to the class proceeding and to force Kobel and Houston to arbitrate only their own claims. The district court granted summary judgment in JPay's favor, holding

---

[*] Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

2

that the availability of class arbitration was a "question of arbitrability," which meant that it was presumptively for the court to decide; that nothing in the terms of this agreement rebutted that presumption; and finally that class arbitration was not available under the terms of the agreement.  Thus, a court, not an arbitrator, would resolve, and the district court did resolve, whether the arbitration could proceed on a class basis.

After careful review, we are satisfied that the district court correctly determined that the availability of class arbitration is a "question of arbitrability," presumptively for the court to decide, because it is the kind of gateway question that determines the type of dispute that will be arbitrated.  Courts cannot assume that parties would want these kinds of questions to be arbitrated unless an agreement evinces a clear and unmistakable intent to send them to arbitration.  However, we also conclude that the language these parties used in their contract expressed their clear intent to overcome the default presumption and to arbitrate gateway questions of arbitrability, including the availability of class arbitration.

Accordingly, we vacate the grant of summary judgment to JPay, reverse the denial of Kobel and Houston's motion to compel arbitration, and remand for proceedings consistent with this opinion.  See Parnell v. CashCall, Inc., 804 F.3d 1142, 1149 (11th Cir. 2015).  The parties agreed, and we are required to give

meaning to their agreement and to enforce their will.  Thus, an arbitrator will decide whether the arbitration can proceed on a class basis.

I.

JPay's services allow friends and family of inmates around the country to purchase various goods and services on inmates' behalf.  These include video chats, music downloads, and, most relevant here, money transfers to inmates' accounts.  Cynthia Kobel and Shalanda Houston each used JPay services to send electronic money transfers to inmates.  Like all JPay users, they agreed to JPay's Terms of Service, including to the following language, which requires that any dispute that might arise between the company and its users be resolved through arbitration:

> In the event of <u>any dispute, claim or controversy among the parties</u> arising out of or relating to this Agreement that involves a claim by the User for less than $10,000, exclusive of interest, arbitration fees and costs, shall be resolved by and through arbitration administered by the American Arbitration Association ("AAA") under its Arbitration Rules for the Resolution of Consumer Related Disputes. <u>Any other dispute, claim or controversy among the parties</u> arising out of or relating to this Agreement shall be resolved by and through arbitration administered by the AAA under its Commercial Arbitration Rules. <u>The ability to arbitrate the dispute, claim or controversy shall likewise be determined in the arbitration.</u> The arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the rules of the American Arbitration Association. Both the foregoing Agreement of the parties to arbitrate <u>any and all such disputes, claims and controversies</u>, and the results, determinations, findings, judgments and/or awards rendered through any such arbitration shall be final and binding on the parties and may

4

be specifically enforced by legal proceedings in any court of competent jurisdiction.

(emphasis added).

On October 16, 2015, Kobel and Houston filed a Demand for Arbitration against JPay with the AAA.  They alleged contractual violations and violation of a Florida consumer protection statute.  They said that JPay charged "exorbitant transfer fees" for money-transfers, and used these fees to fund kickbacks to corrections departments.  Further, they alleged that JPay dissuaded users from sending money through paper money orders -- a free alternative to JPay transfers -- by intentionally making the money order process slow and complicated and by deceptively marketing money orders as unreliable.  Kobel and Houston sought to represent a class consisting of "[a]ll natural persons who paid a fee to JPay for electronic money-transfer services and who agreed to arbitrate their claims with [JPay]."

JPay responded by filing a complaint in Florida state court (the Eleventh Judicial Circuit in Miami-Dade County) seeking declaratory relief specifying the parties' rights and duties under the arbitration provision, seeking to stay class arbitration, and seeking to compel bilateral arbitration of the underlying claims. Kobel and Houston removed the case to federal court in the Southern District of Florida, invoking diversity jurisdiction under the Class Action Fairness Act of

5

2005, Pub. L. No. 109-2, 119 Stat. 4.  28 U.S.C. § 1332(d).[1]  Kobel and Houston then moved to compel arbitration on the question of whether class arbitration was available under JPay's Terms of Service.  Their view was that the parties had expressly agreed to arbitrate whether they were entitled to class relief, and therefore that the district court was required to leave that question to the arbitrator.  The appellants also sought to stay the federal court proceedings pending the outcome of that arbitration.  JPay, in turn, asked the district court for summary judgment, arguing that while it had agreed to arbitrate with its users on a bilateral basis, it had never consented to arbitrate on a class basis.  Further, JPay said that a federal court -- not an arbitrator -- should determine whether class arbitration was available.

The district court denied the motion to compel arbitration, finding that the availability of class arbitration was a substantive "question of arbitrability," presumptively for the court to decide, and that the Terms of Service did not clearly and unmistakably evince an intent to overcome this presumption and to send the question to arbitration.  Kobel and Houston appealed that determination to this Court, but we dismissed the interlocutory appeal for lack of jurisdiction.  JPay, Inc. v. Kobel, No. 16-12917-EE (11th Cir. Jan. 23, 2017).  The district court then

---

[1] In relevant part, and subject to certain exceptions, 28 U.S.C. § 1332 gives federal district courts jurisdiction over class actions in which the amount in controversy (aggregating the class members' claims) exceeds $5 million, the class includes 100 or more individuals, and at least one member of the class is diverse from any defendant.  28 U.S.C. § 1332(d).

granted JPay's motion for summary judgment. It determined that class arbitration was not available under the parties' agreement because the agreement was silent on the availability of class arbitration and the availability of class arbitration could not be implied from the agreement.

Kobel and Houston timely appealed to this Court.

## II.

"We review de novo both the district court's denial of a motion to compel arbitration and the district court's interpretation of an arbitration clause." Jones v. Waffle House, Inc., 866 F.3d 1257, 1263 (11th Cir. 2017) (citations omitted).

Arbitration is a matter of contract and of consent. "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648–49 (1986). The Federal Arbitration Act ("FAA"), Pub. L. No. 68-401, 43 Stat. 883 (1925) (codified as amended at 9 U.S.C. § 1 et seq.), treats contractual agreements to arbitrate "on an equal footing with other contracts," Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 67 (2010), and "imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 681 (2010) (quotation omitted). The FAA "reflect[s] both a liberal federal policy favoring arbitration and the fundamental principle that

arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (quotations and citation omitted). Where the parties have agreed to arbitrate their dispute, the job of the courts -- indeed, the obligation -- is to enforce that agreement. See, e.g., Stolt-Nielsen, 559 U.S. at 682 ("[T]he central or 'primary' purpose of the FAA is to ensure that private agreements to arbitrate are enforced according to their terms." (quotation omitted)). At the same time, courts may not require arbitration beyond the scope of the contractual agreement, because "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).

When, despite our best interpretive efforts, a contract is ambiguous or silent on the parties' intent to arbitrate a particular question, we work from a set of default presumptions, laid out by the Supreme Court, which help us determine what the contracting parties intended. See, e.g., Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (describing the inquiry into whether a question should be sent to arbitration as an attempt to identify whether "contracting parties would likely have expected a court to have decided"). "[A]ny doubts concerning the scope of arbitrable issues" -- that is, doubts over whether an issue falls within the ambit of what the parties agreed to arbitrate -- "should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1,

8

24–25 (1983).  This is because parties whose contract "provides for arbitration of some issues . . . likely gave at least some thought to the scope of arbitration."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 945 (1995).  In these circumstances, we apply "the law's permissive policies in respect to arbitration" and send to arbitration the question that is arguably within the agreement's scope.  Id.  The reasoning behind this rule is that if the parties thought about what they wanted to arbitrate, we can safely assume they thought about and articulated what they didn't want to arbitrate.  We assume their intent to arbitrate anything not specifically excluded.

Notably, this presumption is reversed, however, when the contract presents ambiguity on the assignment of a "question of arbitrability" -- when it is unclear "whether a party has agreed that arbitrators should decide arbitrability."  Id. at 944 (emphasis added).  Questions of arbitrability, often described as "gateway" questions, e.g., Rent-A-Ctr., 561 U.S at 68–69, are higher-order questions.  They are presumptively for the courts because, as the Supreme Court put it, they are "rather arcane," and because we cannot presume they crossed the parties' minds.  First Options, 514 U.S. at 945.  "A party often might not focus . . . upon the significance of having arbitrators decide the scope of their own powers," id., and so, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability," but instead should presume that the question remains with the court.  Id. at 944;

AT&T Techs., 475 U.S. at 649 ("[T]he question of arbitrability . . . is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). Assuming that the parties agreed to arbitrate arbitrability "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." First Options, 514 U.S. at 945. Thus, we require "clear and unmistakable evidence" of intent before we send questions of arbitrability to arbitration. Id. at 944 (alterations omitted) (quoting AT&T Techs., 475 U.S. at 649); Waffle House, 866 F.3d at 1267.

To summarize, then, when faced with "silence or ambiguity about the question whether a particular merits-related dispute is arbitrable," we presume that an arbitrator will decide the merits-related dispute. First Options, 514 U.S. at 944 (quotations omitted). But, when faced with "silence or ambiguity about the question 'who (primarily) should decide arbitrability,'" we presume that a court will decide arbitrability. Id. Questions of arbitrability, then, stay with the court "unless there is 'clear and unmistakable evidence' that the parties intended to submit such questions to an arbitrator." Dean Witter Reynolds, Inc. v. Fleury, 138 F.3d 1339, 1342–43 (11th Cir. 1998) (emphasis added); see also Howsam, 537 U.S. at 83.

10

We start, then with our first question: whether the availability of class arbitration is a question of arbitrability, presumptively for the courts to decide. Because we answer the question affirmatively and hold that this question is presumptively for the courts and not the arbitrator, we must answer the second question in this case: whether the words the parties used in their agreement "clearly and unmistakably provide" that the parties intended to overcome the default presumption and delegate the question to arbitration. Howsam, 537 U.S. at 83. After close review of the words these parties used in their agreement, we hold that they clearly intended to send the matter to arbitration for decision.

## A.

A question of arbitrability is one of a narrow range of "potentially dispositive gateway question[s]," specifically one that "contracting parties would likely have expected a court to . . . decide[]." Howsam 537 U.S. at 83. These are fundamental questions that will determine whether a claim will be brought before an arbitrator, and include questions about whether particular parties are bound by an arbitration clause and questions about whether a clause "applies to a particular type of controversy." Id. at 84. Because we will not compel anyone to arbitrate if we aren't confident they have agreed to do so, we presume that parties would have expected a court to answer questions of arbitrability. First Options, 514 U.S. at 945; see John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546–47 (1963)

("Under our decisions, whether or not the [party] was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.").

As we see it, questions of arbitrability are better understood as substantive questions, rather than as "procedural" issues "which grow out of the dispute and bear on its final disposition." Howsam, 537 U.S. at 84; see also id. at 85 (quoting approvingly a uniform law describing that "in the absence of an agreement to the contrary, issues of substantive arbitrability are for a court to decide and issues of procedural arbitrability . . . are for the arbitrators to decide" (alteration omitted) (quoting Revised Unif. Arbitration Act § 6 cmt. 2 (Nat'l Conference of Comm'rs on Unif. State Laws 2000))). "Procedural" questions are presumptively for the arbitrator to decide. They include whether the parties have fulfilled "prerequisites to arbitration," like time limits or notice requirements, as well as defenses like waiver and delay. Id. at 84–85.

We have no binding precedent on whether the availability of class arbitration is a fundamental question of arbitrability for the courts. Fifteen years ago, a Supreme Court plurality held that it was not a question of arbitrability for the courts to decide, in Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003). There, four justices reasoned that the availability of class arbitration "concern[ed] neither the validity of the arbitration clause nor its applicability to the underlying

12

dispute," but rather "concern[ed] contract interpretation and arbitration procedures" which arbitrators were "well situated" to analyze. Id. at 452–53 (plurality opinion). Kobel and Houston urge that we follow Bazzle and hold that class availability is a "procedural" question. Unfortunately for them, the Court has since emphasized on two occasions that the Bazzle plurality's holding is nonbinding and that the question remains an open one. First, in Stolt-Nielsen S. A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010), the Court noted that in Bazzle, "no single rationale commanded a majority," id. at 678, and thus, that "Bazzle did not yield a majority decision" on the question of who, by default, decides whether class arbitration is available, id. at 679. Again, and unanimously, in Oxford Health Plans LLC v. Sutter, 569 U.S. 564 (2013), the Justices told us that "this Court has not yet decided whether the availability of class arbitration is a question of arbitrability." Id. at 569–70 n.2. Although neither case states explicitly that the Bazzle plurality was incorrect, the Court has repeated that we are not bound by it. This necessarily would lead us to proceed cautiously even if we found Bazzle's reasoning persuasive. Without an answer from the Supreme Court or from our own precedents, we are required to conduct our own analysis. See S. Commc'ns Servs., Inc. v. Thomas, 720 F.3d 1352, 1359 n.6 (11th Cir. 2013) ("Like the Supreme Court, we also have not decided whether the availability of class arbitration is a question of arbitrability."); see also Spirit Airlines v. Maizes,

13

No. 17-14415, 2018 WL 3866335 at *4 n.5 (Aug. 15, 2018).  Lacking any controlling precedent, we conclude for the first time in this Circuit that the availability of class arbitration is a question of arbitrability, presumptively for the courts to decide.

The availability of class arbitration is a "potentially dispositive gateway question."  Howsam, 537 U.S. at 83.  The availability of class arbitration is a gateway or threshold question, both formally and functionally.  Formally, the question whether class arbitration is available will determine the scope of the arbitration proceedings.  In class arbitration, like in a class action, representative plaintiffs make their case before the adjudicator on behalf of a host of similarly situated plaintiffs who will have the opportunity to collect damages if the class wins.  Procedures like notice requirements and opt-out opportunities protect the interests of these absent class members, but, nonetheless, allowing a class proceeding means determining the rights of many parties who are not actively involved, not represented by their own counsel, and, in all likelihood, not paying attention.  Class availability opens a "gateway" to the arbitration proceedings, through which thousands of these absent class members might pass if a class is available.  If, on the other hand, a class is not available, the representative plaintiffs, here, Kobel and Houston, will argue only for themselves.  From a defendant's perspective the size of the "gateway" is important because class

14

arbitration is much more time consuming and complex -- it requires different allocations of resources and attention, and possibly different counsel, as compared with the alternative of hundreds of individual arbitrations, each of which would be a fairly simple proceeding.

Functionally, too, this is a gateway question. Many, if not most, putative class proceedings, are for relatively small-dollar claims. If claimants must act on an individual basis, the cost of arbitrating any single claim would certainly outweigh their expected recovery. No single bilateral arbitration would be rational. Only by joining together as a class do they make arbitration efficient. Essentially, the plaintiffs pool their resources, paying one filing fee, and paying one team of attorneys to argue on behalf of the whole class. Each plaintiff still stands to recover only a small dollar amount, but they won't have to spend as much to prosecute their claim. In many cases, they won't end up paying anything because the parties will reach a settlement whereby the defendant pays attorney's fees. This increases liability for defendants like JPay because many consumer plaintiffs who would never have dreamed of taking the time to pursue claims on their own will be perfectly happy to collect their share of the recovery earned in class proceedings conducted on their behalf but without their knowledge. Class proceedings will thus remove the economic barrier blocking the "gateway" to arbitration for many plaintiffs.

Identifying class availability as a potentially dispositive gateway question does not conclude our analysis, though, because "the phrase 'question of arbitrability' has a far more limited scope." Howsam, 537 U.S. at 83. Plenty of gateway matters could dispose of a case, but questions of arbitrability only arise in the "narrow circumstance where contracting parties would likely have expected a court to decide the gateway matter." Id. The Court has been perfectly comfortable assuming that parties to an agreement implicitly agreed to arbitrate "procedural" matters like whether prerequisites to arbitration were fulfilled, whether waiver or delay defenses are available, or whether plaintiffs have run into trouble with "time limits, notice, laches, estoppel," and the like. Id. at 84–85. If the parties agreed to arbitrate something, but were silent on these sorts of "procedural" questions, the Court hasn't thought it unfair to throw these to arbitration as well, even if the case's disposition might depend on the answer. See id. at 83–84. The Court has identified, in Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), only two categories presenting the "narrow circumstance" in which we presume that the question remains with the courts. See id. at 83–84. These two categories of questions of arbitrability -- presumptively for the courts to decide -- are questions "about whether the parties are bound by a given arbitration clause"[2] and questions

---

[2] Because we are confident that the availability of class arbitration falls in the second category identified in Howsam, we need not decide the more difficult question whether it falls in this first

16

"about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Id. at 84.

The availability of class arbitration fits squarely in the second category because it relates to "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Howsam, 537 U.S. at 84. A class-based proceeding yields "fundamental changes" in the arbitration process, as the Supreme Court has emphasized in related contexts. Stolt-Nielsen, 559 U.S. at 686 ("[C]lass-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." Id. at 685.). Class arbitration is very different from bilateral arbitration in several important ways identified by the Court: Bilateral arbitration is designed to be more efficient than litigation in court, but class arbitration is complex, forfeiting some of the efficiency that parties likely hoped to achieve by agreeing to arbitrate. See id. at 685–86. Similarly, class arbitration, involving more parties, is less confidential than bilateral arbitration, undermining another key advantage of arbitration. See id. at 686. Class arbitration, like a class

---

one. The Third Circuit has said that class availability does relate to "whether the parties are bound by a given arbitration clause" because the inclusion or exclusion of absent class members concerns "whose claims an arbitrator may decide." Opalinski v. Robert Half Int'l, Inc., 761 F.3d 326, 332 (3d Cir. 2014). On the other hand, class availability does not relate to whether any particular party is bound to arbitrate its claims, but only to whether they may be arbitrated together. So the availability of a class could be seen as lacking any effect on whose claims the arbitrator may decide and as only influencing whose claims the arbitrator will decide in a given proceeding.

17

action, can bind absent parties in a way that bilateral proceedings would not. See id. Class arbitration also entails a significant increase in a defendant's potential liability, while retaining the relatively limited scope of judicial review available following an arbitration decision. See id. at 686–87; see also Hall St. Assocs., LLC v. Mattel, Inc., 552 U.S. 576, 588 (2008) (holding that the FAA permits "just the limited review [of arbitration decisions] needed to maintain arbitration's essential virtue of resolving disputes straightaway" and not "full-bore legal and evidentiary appeals"). Class arbitration is, therefore, a different "type" of proceeding, and we should assume that parties contracting to arbitrate their disputes would still typically have wanted a court to decide whether it was available.

The Supreme Court's analysis in Stolt-Nielsen, and Sutter supports our conclusion. Thus, for example, in Sutter, the Supreme Court observed that "Stolt-Nielsen flagged that [class availability] might be a question of arbitrability." Sutter, 569 U.S. at 570 n.2. In Stolt-Nielsen, the parties agreed that they had "expressly assigned . . . to the arbitration panel" the question whether a class was available. Stolt-Nielsen, 559 U.S. at 680. Unlike in our case, the Court did not have occasion to consider whether class availability was a question of arbitrability presumptively for the court to decide, or a question for the arbitrators, because the express assignment overcame any presumption otherwise. See id. With the "who

18

decides" question settled, the Court only faced and only decided the underlying merits question of whether class arbitration was available, and held that class arbitration could not be compelled absent a "contractual basis" on which the parties could be said to have agreed to class proceedings. Id. at 684. Class proceedings were simply too different, for the reasons we have stated -- less efficiency, less confidentiality, impact on absent parties, and increased liability, yet with only the weak judicial review given to arbitral decisions. See id. at 686–87. The following term, in AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011), the Court reiterated and expanded on these differences. Id. at 346–51. Again, unlike in our case, the question of "who decides" was not at issue; these differences were discussed in the context of evaluating whether a California Supreme Court doctrine that would have forced parties into class arbitration without their explicit consent was preempted by the FAA (it was). See id. at 348.

Neither Stolt-Nielsen nor Concepcion considered whether class arbitration is the same "type" of controversy as bilateral arbitration, but, because the Court has been so clear that these distinctions are highly significant, we find these cases relevant to our consideration of that question. If class proceedings are available, the arbitration is fundamentally changed. Thus, we cannot read consent to arbitration and silence on the class availability question as necessarily implying

19

consent to an arbitrator's deciding whether a very different "type" of proceeding is available.  As a result, class availability is a question of arbitrability.

Our view is confirmed because the availability of class arbitration does not present a "procedural" question of the sort that is presumptively for the arbitrator to decide.  See Howsam, 537 U.S. at 84–85 (identifying such questions as "presumptively not for the judge, but for an arbitrator," id. at 84).  Stolt-Nielsen is again instructive.  There, the Supreme Court rejected the idea that class arbitration was "merely [a] 'procedural mode.'"  Stolt-Nielsen, 559 U.S. at 687.  If the question were merely one of procedure, "there would be no need to consider the parties' intent with respect to class arbitration."  Id. (citing Howsam, 537 U.S. at 84).  Consistent with "the consensual basis of arbitration," we must ask "whether the parties agreed to authorize class arbitration."  Id.  Framing the question as merely a "procedural" matter elides the real differences between bilateral and class arbitration, and undermines the parties' freedom to shape their own agreement.

The availability of class arbitration is dissimilar from those questions that courts have identified as "procedural" in this context.  In an older case, the Supreme Court was faced with the questions whether an arbitration clause between an employer and a union survived the employer's merger with another corporation, and whether a court or arbitrator should make determinations about prerequisites to arbitration.  John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 544 (1964).

20

These determinations included "whether grievance procedures . . . ha[d] been followed or excused, [and] whether the unexcused failure to follow them avoid[ed] the duty to arbitrate." Id. at 557. These were "procedural" questions, not questions of arbitrability, because they presented "intertwined issues of 'substance' and 'procedure' growing out of a single dispute." Id. And, the Court added, it would be strange to "carve[] up [the intertwined issues] between two different forums," because the answers "depend[ed] to a large extent on how one answers questions bearing on the basic issue" to be arbitrated, which related to the effect of the merger on the parties' contract. Id. Since the underlying dispute would be arbitrated, questions about whether the prerequisites had been met were "procedural" and did not call into question the arbitrability of the dispute.

The availability of class arbitration is not the same kind of question. Whether class proceedings are available does not depend on how one views the "basic issue" -- the merits of the case -- but is a separate matter of contract interpretation. Here, a court could review JPay's Terms of Service for intent to arbitrate on a class basis without considering JPay's business practices in the least. Nor is class availability the kind of obviously "procedural" prerequisite that derives from the terms of the contract. See, e.g., Howsam, 537 U.S. at 85 (identifying as "procedural" questions "whether prerequisites such as time limits,

21

notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met" (emphasis removed)).

Our conclusion that the availability of class arbitration is a fundamental question of arbitrability that should presumptively be decided by a court is consistent with the views of four circuits that have considered the same question since Stolt-Nielsen. The first such case was Reed Elsevier, Inc. v. Crockett, 734 F.3d 594 (6th Cir. 2013), in which the Sixth Circuit considered the concerns raised in Stolt-Nielsen and Concepcion as it analyzed the differences between bilateral and class arbitration. Id. at 598. The Sixth Circuit reviewed the now-familiar concerns that these cases raise: class arbitration is less efficient and less confidential than bilateral arbitration. Id. Class proceedings also raise the stakes of arbitration for defendants and adjudicate the rights of absent parties, who must then be afforded notice, opportunities to be heard, and opt-out rights. Id. The Sixth Circuit discerned the same message we did from these cases, and found that they amounted to "the Court [having] given every indication, short of an outright holding, that classwide arbitrability is a gateway question." Id. It concluded that "whether the parties arbitrate one claim or 1,000 in a single proceeding is no mere detail" but rather presents a "gateway question" for the courts. Id. at 598–99. For the Sixth Circuit, the availability of class arbitration was even more consequential

than the availability of arbitration in and of itself, and thus there was even more reason to be careful not to force it on an unwilling party. Id. at 599.

Other circuits followed, beginning with the Third Circuit in Opalinski v. Robert Half International, Inc., 761 F.3d 326, 333–35 (3d Cir. 2014). The Fourth and Eighth Circuits reached the same conclusion, also relying heavily on Stolt-Nielsen and Concepcion. Catamaran Corp. v. Towncrest Pharmacy, 864 F.3d 966, 971–72 (8th Cir. 2017); Dell Webb Cmtys., Inc. v. Carlson, 817 F.3d 867, 874–77 (4th Cir. 2016). Against these circuits, the California Supreme Court has expressed a contrary view, Sandquist v. Lebo Auto. Inc., 376 P.3d 506, 522–23 (Cal. 2016), and the Fifth Circuit has stood by an earlier circuit precedent that had followed the Bazzle plurality. Robinson v. J & K Admin. Mgmt. Servs., Inc., 817 F.3d 193, 197 (5th Cir. 2016) (following Pedcor Mgmt. Co. v. Nations Pers. of Tex., Inc., 343 F.3d 355 (5th Cir. 2003)). Still, every federal court of appeals to have considered the question anew since Stolt-Nielsen has determined that class availability is a fundamental question of arbitrability.

We do the same today. We hold that the availability of class arbitration is a question of arbitrability, presumptively for a court to decide, because it is a gateway question that determines what type of proceeding will determine the parties' rights and obligations. The differences between class and bilateral arbitration are substantial, and have been repeatedly emphasized by the Supreme

23

Court.  In light of these differences, we think it likely that contracting parties would expect a court to decide whether they will arbitrate bilaterally or on a class basis.  We leave the question of class availability presumptively with the court because we do not want to force parties to arbitrate so serious a question in the absence of a clear and unmistakable indication that they wanted to do so.

We note in passing that although we hold the question of class arbitration availability is properly categorized as a question of arbitrability, the question in this case would be headed for arbitration either way.  This is so because we find that JPay and its users expressly delegated questions of arbitrability, and we therefore instruct the district court to compel arbitration on class availability.  If, instead, we had held that class arbitration availability was a "procedural" question presumptively for the arbitrator, we would still instruct the district court to compel arbitration on class availability.

## B.

Having concluded that the availability of class arbitration is a question of arbitrability, we presume that it is a question for courts to decide, and we turn to the language in the parties' agreement to determine whether anything in it clearly and unmistakably evinces a shared intent to overcome that presumption.  The Supreme Court has made clear that "parties can agree to arbitrate 'gateway' questions of 'arbitrability'" because "arbitration is a matter of contract."  Rent-A-

Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68–69 (2010).  "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  Id. at 70.  Since the parties plainly have it in their power to agree that an arbitrator should decide whether class arbitration is available, we turn to the language of JPay's Terms of Service and the question becomes a textual one.

1.

We find a clear and unmistakable intent to delegate questions of arbitrability to the arbitrator throughout the arbitration provision in JPay's Terms of Service. First, it references AAA rules three times.  It states that any and all disputes, claims, or controversies will be resolved "by and through arbitration administered by the [AAA]" either "under its Arbitration Rules for the Resolution of Consumer Related Disputes" or "under its Commercial Arbitration Rules," and later that "[t]he arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the rules of the [AAA]."  Under controlling Circuit precedent, this alone serves as a clear and unmistakable delegation of questions of arbitrability to an arbitrator, a conclusion confirmed by the agreement's subsequent reference to "the rules of the [AAA]" in general terms.  Second, and quite independently, the parties expressly agreed that "[t]he ability to arbitrate the dispute, claim or

25

controversy shall likewise be determined in the arbitration." Finally, the agreement is written in unmistakably broad terms, as the parties agreed "to arbitrate any and all such disputes, claims and controversies." (emphasis added). Either of the first two of these statements would amount to a clear and unmistakable delegation of questions of arbitrability to the arbitrator. Together, and with the addition of the third, their expression of intent is unequivocal. We address each in turn.

We begin with our case precedent -- Terminix International Co. v. Palmer Ranch Ltd. Partnership, 432 F.3d 1327 (11th Cir. 2005); U.S. Nutraceuticals, LLC v. Cyanotech Corp., 769 F.3d 1308 (11th Cir. 2014); and, most recently, Spirit Airlines, Inc. v. Maizes, No. 17-14415, 2018 WL 3866335 (Aug. 15, 2018). Collectively, these cases dictate that by incorporating AAA rules into an agreement parties clearly and unmistakably evince an intent to delegate questions of arbitrability. In Terminix, this Court considered an arbitration agreement that the claimant said was unenforceable because it improperly limited remedies and rights. Terminix, 432 F.3d at 1329. This question "ultimately [went] to the validity of the parties' agreement to arbitrate" -- that is, it was a question of arbitrability. Id. at 1331; see id. at 1331–32. We explained that questions like these "ordinarily" would be reviewed by a court. Id. at 1331. That default rule was overcome in Terminix, though, because the arbitration agreement at issue there provided that

26

"arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the [AAA]." Id. at 1332. Those rules, in turn, gave the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Id. In agreeing to arbitrate according to rules that granted this power to the arbitrator, we reasoned, the parties in Terminix clearly and unmistakably agreed that the arbitrator would have this power. Id. Citing comparable rulings drawn from other circuit courts, we held that incorporating such rules into their agreement meant that "the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid." Id.; see, e.g., Contec Corp. v. Remote Sol. Co., 398 F.3d 205, 208 (2d Cir. 2005) ("[T]he incorporation [of rules that empower an arbitrator to decide issues of arbitrability] serves as clear and unmistakable evidence of the parties' intent to delegate such issues to the arbitrator.").

More recently, in U.S. Nutraceuticals, we clarified the scope of Terminix's holding, and put it in the more familiar terms of questions of arbitrability. In U.S. Nutraceuticals, the parties' agreement did not reference any particular AAA rules, but contained an agreement to arbitrate "under the auspices and rules of the [AAA]." Id. at 1309–10. Unlike in Terminix, this language referenced and

27

incorporated AAA rules in general, not any specific set of AAA rules.[3]  In U.S.

Nutraceuticals, class arbitrability was not at issue, but the parties disagreed as to

whether they were bound by their arbitration agreement.  See U.S. Nutraceuticals,

769 F.3d at 1310.  Citing Terminix, we held that "[w]hen the parties

incorporated . . . the [AAA Rules], they clearly and unmistakably contracted to

submit questions of arbitrability to an arbitrator."  Id. at 1311 (citing Terminix, 432

F.3d at 1332).  Incorporating relevant AAA rules, we said, is a clear and

unmistakable indication of the parties' intent for the arbitrator to decide not just

whether the arbitration clause is valid, but whether it applies.  Id.  We did not

interrogate which specific AAA rules were incorporated through the contract's

general incorporation language, but simply followed the rule of Terminix.

By expressly incorporating two sets of AAA rules, JPay's Terms of Service

clearly and unmistakably give the arbitrator power to rule on his own jurisdiction,

thus delegating questions of arbitrability to the arbitrator.  JPay's Terms of Service

mention two sets of AAA rules, the Arbitration Rules for the Resolution of

Consumer Related Disputes and the Commercial Arbitration Rules.  Each uses the

same language as the AAA rules that were incorporated in Terminix, providing

that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction,

[3] The AAA maintains over fifty different sets of rules that it designates as "active," and which might be employed in a given arbitration proceeding.  See Active Rules, Am. Arbitration Ass'n (2018), https://www.adr.org/active-rules.

28

including any objections with respect to the existence, scope, or validity of the arbitration agreement." Am. Arbitration Ass'n, Consumer Arbitration Rules R-14(a) (2016), https://www.adr.org/sites/default/files/Consumer%20Rules.pdf; Am. Arbitration Ass'n, Commercial Arbitration Rules and Mediation Procedures R-7(a) (2013), https://www.adr.org/sites/default/files/CommercialRules_Web.pdf; see also Terminix, 432 F.3d at 1332 (quoting identical language). Terminix is squarely on point because the AAA rules incorporated by the Terminix agreement -- a prior version of the AAA commercial rules -- used precisely the same language as the rules incorporated by the JPay Terms of Service. Each set of rules gives the arbitrator "the power to rule on his or her own jurisdiction."

Terminix does not require that a particular question of arbitrability be addressed in the incorporated AAA rules. JPay notes, accurately, that neither set of rules incorporated into their Terms of Service either mentions class arbitration or expressly incorporates the AAA Supplementary Rules on Class Arbitration, which do, of course, discuss class arbitration.[4] But Terminix dictates, without any

---

[4] The supplementary rules, for their part, purport to reverse-incorporate themselves into all other AAA rules by stating that they "shall apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the [AAA]." Am. Arbitration Ass'n, Supplementary Rules for Class Arbitrations at 1(a) (2010), https://www.adr.org/sites/default/files/Supplementary%20Rules%20for%20Class%20Arbitrations.pdf. JPay suggests we follow those courts that have refused to credit the "daisy-chain of cross-references" required for the supplemental rules to apply when a contract mentions only a set of AAA rules that neither refer

29

caveat, that we read an arbitration agreement incorporating AAA rules containing this language as clear and unmistakable evidence that the parties contracted around the default rule and intended to delegate questions of arbitrability to the arbitrator. Terminix, 532 F.3d at 1332. After Terminix, and certainly after U.S. Nutraceuticals, in this Circuit, JPay need not have consented to rules specifically contemplating class proceedings in order to have delegated the question of class availability via incorporation of AAA rules. The incorporation of the AAA consumer and commercial rules are enough because they grant the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Id.

Spirit Airlines reinforces our decision. It addressed delegation of the precise question of arbitrability that concerns us today. In Spirit Airlines, as here, the parties disagreed as to whether class arbitration was available. See Spirit Airlines, 2018 WL 3866335 at *1. In their agreement, the parties in Spirit Airlines had agreed that "[a]ny dispute . . . will be resolved by submission to arbitration . . . in accordance with the rules of the [AAA] then in effect." Id. The agreement made no specific mention of class arbitration. We held again that we were bound by the

---

to class proceedings nor incorporate the supplementary rules. E.g., Chesapeake Appalachia, LLC v. Scout Petrol., LLC, 809 F.3d 746, 761 (3d Cir. 2016). Because we are bound to follow the more straightforward result dictated by Terminix, U.S. Nutraceuticals, and Spirit Airlines, we need not and do not evaluate what the supplementary rules accomplish through this attempt at reverse-incorporation.

30

reasoning of <u>Terminix</u>.  <u>Id.</u> at *3.  We explained that by incorporating AAA rules in general terms, the parties had incorporated the Supplementary Rules for Class Arbitrations.  <u>Id.</u>  Rule 3 of the Supplementary Rules explains that class availability will be decided by the arbitrator.  <u>Id.</u>  Just like in <u>Terminix</u>, the agreement was read as evincing a clear and unmistakable intent to arbitrate according to the incorporated AAA rules. <u>Id.</u>  We thus concluded that incorporating the Supplementary Rules constituted "clear and unmistakable evidence that the parties chose to have an arbitrator decide whether their agreement provided for class arbitration."  <u>Id.</u>

The long and short of it is that our case precedent compels that we read the JPay agreement as clearly and unmistakably evincing an intent to delegate questions of arbitrability.

Moreover, and altogether independent of incorporating the AAA rules, the language these parties employed in this agreement evinces the clearest possible intent to delegate questions of arbitrability to the arbitrator.  The Terms of Service provide that "[t]he ability to arbitrate the dispute, claim or controversy shall likewise be determined in the arbitration" and later refer to "the foregoing Agreement of the parties to arbitrate <u>any and all</u> such disputes" (emphasis added).  Even if we were to assume that the incorporation of AAA Rules failed, in some way, to delegate questions of arbitrability -- and our case law has plainly rejected

31

that view -- we would still find that this language sufficed to do so.  Unlike incorporating AAA Rules, which are separate documents that parties to the agreement might not have read, this delegation clause has an express meaning that would be obvious and comprehensible to any careful reader of the agreement.  At the absolute least, its significance would have been obvious to the JPay attorneys who drafted the Terms of Service.

In fact, in the past, we have found that comparable language expressed a clear and unmistakable intent to delegate questions of arbitrability in general.  E.g., Jones v. Waffle House, Inc., 866 F.3d 1257, 1267 (11th Cir. 2017) (interpreting a contract stating that "the Arbitrator . . . shall have authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement"); Martinez v. Carnival Corp., 744 F.3d 1240, 1245–46 (11th Cir. 2014) (interpreting a delegation of "any and all disputes arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination," id. at 1245).  Other circuits have also specifically found that comparable language delegated the precise question of class arbitrability.  Wells Fargo Advisors, Inc. v. Sappington, 884 F.3d 392, 395 (2d Cir. 2018) (interpreting a contract stating that "[a]ny controversy relating to your duty to arbitrate hereunder, or to the validity or enforceability of this arbitration clause, or to any defense to arbitration, shall also be arbitrated"); Robinson v. J & K Admin.

32

Mgmt. Servs., Inc., 817 F.3d 193, 198 (5th Cir. 2016) ("The agreement required arbitration of . . . 'claims challenging the validity or enforceability of this Agreement . . . or challenging the applicability of the Agreement to a particular dispute or claim.'" Id. at 194.).  Put succinctly, an express delegation clause like this one delegates questions of arbitrability, one of which is the question of class availability.

The Second Circuit reached the same conclusion in Wells Fargo v. Sappington, 884 F.3d 392 (2d Cir. 2018), when it rejected the same argument JPay makes today -- that an arbitration agreement delegating questions of arbitrability nonetheless does not delegate the question of class availability if written using "bilateral terminology." Id. at 397; see id. at 397–98.  There, the Second Circuit was reading a contract in light of a Terminix-equivalent precedent dictating that incorporating "[AAA] rules that empower an arbitrator to decide issues of arbitrability . . . serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." Id. at 396 (quoting Contec Corp. v. Remote Sol. Co., 398 F.3d 205, 208 (2d Cir. 2005)).  The defendant, Wells Fargo, argued that "the 'bilateral terminology' of the contracts -- 'you and Wells Fargo,'" meant that "the parties did not intend to let an arbitrator decide the class arbitration availability question in particular." Id. at 397.  The Second Circuit thought that bilateral terminology was "to be expected in an employment contract" and pointed

33

out that "even an express contractual statement concerning class arbitration could easily be phrased in bilateral terms." Id. at 397–98 (considering the hypothetical language "[y]ou and Wells Fargo agree that the availability of class arbitration . . . shall be determined by an arbitrator," id. at 398).  Similarly here, the fact that JPay's Terms of Service are written in bilateral terms should not be read for more than it is worth and does not change the fact that questions of arbitrability have unmistakably been delegated.

We add that the breadth of the delegation achieved by the language found in this agreement is as extensive as possible.  Even if, after reviewing the express delegation clause, we were somehow still not sure whether the agreement to delegate "[t]he ability to arbitrate the dispute, claim or controversy" truly expressed an intent to delegate any and all such disputes, claims, or controversies, our uncertainty would be settled by the concluding sentence of the agreement's arbitration provision, which references "the foregoing Agreement of the parties to arbitrate any and all such disputes, claims and controversies."  This phrase cannot refer to anything but the disputes previously mentioned in the arbitration clause, including disputes about arbitrability.  The language cries out with express intent and emphasizes that a broad reading of the foregoing express delegation clause is warranted and is, in fact, what the parties intended when they contracted.  In the past we have held that the delegation of "any" gateway questions entails the

34

delegation of "all" such questions, Waffle House, 866 F.3d at 1267, but this agreement helpfully includes both words already.  The use of such sweeping language serves to reaffirm our reading of the foregoing delegation, and confirms that the parties intended to delegate questions of arbitrability and that our inquiry is thus at an end.  See id. at 1271.

2.

Throughout its argument, JPay points to and relies on three cases drawn from outside our Circuit: Reed Elsevier, Inc. v. Crockett, 734 F.3d 594 (6th Cir. 2013), Chesapeake Appalachia, LLC v. Scout Petroleum, LLC, 809 F.3d 746 (3d Cir. 2016), and Catamaran Corp. v. Towncrest Pharmacy, 864 F.3d 966 (8th Cir. 2017).  We are unpersuaded by JPay's invocation of these cases for three reasons. In the first place, we are bound to follow our own Circuit precedent.  Just recently, Spirit Airlines declined to follow any of these cases, finding no basis for their holdings in Supreme Court precedent.  Spirit Airlines, 2018 WL 3866335 at *4. What's more, Terminix and U.S. Nutraceuticals foreclose their reasoning.  The Third, Sixth, and Eighth Circuits held that incorporation of AAA Rules by reference served to delegate questions of arbitrability generally, but that this did not delegate the specific question of class action availability.  Catamaran, 864 F.3d at 973; Chesapeake Appalachia, 809 F.3d at 761–62; Reed Elsevier, 734 F.3d at 599.  Unlike the Eleventh Circuit, the Third and Sixth Circuits did not have

precedents dictating that the incorporation of AAA rules giving an arbitrator the power to rule on his or her own jurisdiction constitutes a clear and unmistakable delegation of questions of arbitrability.[5] Terminix, 432 F.3d at 1332; see also U.S. Nutraceuticals, 769 F.3d at 1311 (applying the holding of Terminix). Much of the reasoning and analysis JPay would have us follow is foreclosed to us because of our obligation to follow our own binding precedents.

In the second place, those cases are factually different in at least one critical way. The parties to those agreements used different language from the words JPay used. Notably, none of those cases included an express delegation of questions of arbitrability. The Third, Sixth, and Eighth Circuits were reviewing contracts that accomplished delegation only by incorporation of the AAA rules. Catamaran, 864 F.3d at 969 (quoting the relevant contractual language); Chesapeake Appalachia, 809 F.3d at 749 (same); Reed Elsevier, 734 F.3d at 599 (same). None faced the language we have here: the incorporation of AAA rules and an express delegation clause. As we have held, either JPay's incorporation of AAA rules or its express delegation clause would have been enough, on its own, to delegate the question of class availability. The combination of the two confirms our reading of each half in isolation. As compared with the contracts reviewed by these other circuits, the

---

[5] The Eighth Circuit did have a Terminix-equivalent precedent but read it as applying only to bilateral arbitration. See Catamaran, 864 F.3d at 973 (citing Fallo v. High-Tech Inst., 559 F.3d 874 (8th Cir. 2009)). As we have explained, we do not agree that the question of class availability ought to be treated separately from other questions of arbitrability in this way.

express delegation clause not only provides a second, independent ground on which to hold as we do, but also confirms our holding on the first ground. No other circuit analyzed a contract with two such mutually reinforcing methods of delegation. And, indeed, the Third Circuit recognized that an express delegation clause in addition to an incorporation of AAA rules would probably have been enough for it to find clear and unmistakable delegation of the class availability question. See Chesapeake Appalachia, 809 F.3d at 758. So even if we could follow the guidance of at least that circuit, we would still be obliged to find that the contractual language in this case accomplishes the delegation of the class availability question.

Finally, as we see it, each of these cases conflates the "who decides" question with the "clause construction" question of class availability by analyzing the former question with reasoning developed in the context of the latter. The questions are conceptually related, but require a distinct analysis. By default, a court presumptively decides whether the parties consented to class arbitration. As we have explained, at this stage, in considering whether JPay, specifically rebutted the application of the default rule, we are asking who decides in this instance. We are not investigating whether JPay consented to class arbitration. That is for the arbitrator to decide. In Stolt-Nielsen and Concepcion the Court made only merits determinations of whether class arbitration was available. These cases raised

37

important concerns about why we should not force parties to class arbitration without a contractual basis to do so, but considering these concerns at the higher-order "who decides" stage conflates that stage with the merits.

The concerns raised in Stolt-Nielsen do not apply, as a doctrinal matter, to the "who decides" question of contractual intent to delegate.  We alluded to this confusion in Spirit Airlines. Spirit Airlines, 2018 WL 3866335 at *4.  Our earlier analysis of the default rule -- who decides when a contract is silent -- depended on policy judgments.  But the "who decides" question at this stage is a matter of contract interpretation, and we answered it by conducting a close reading of JPay's Terms of Service.  Stolt-Nielsen's concerns about the differences between bilateral and class arbitration have precious little bearing on the textual analysis required to determine "who decides" under this specific contract.  Here we ask only whether the parties intended to delegate the question of class availability.  Having found that the parties intended to delegate, we have no reason -- and, indeed, no power -- to evaluate whether a class proceeding is available or what consequences might result if it is.

The content of the concerns raised in Stolt-Nielsen reaffirms our view. Textual analysis of the agreement to determine the parties' intent does not implicate the fact that class arbitration is less efficient, less confidential, and higher-stakes.  See Stolt-Nielsen, 559 U.S. at 686–87 (raising these concerns).  We

38

have done nothing more than decide (because the parties have agreed) that an arbitrator, not a court, will determine whether a class is available. The arbitrator's decision whether a class is available will be more efficient and more confidential than a court's would be. The determination of class availability has the same stakes and involves the same parties whether it is decided in a court or in arbitration. The arbitrator's decision is somewhat less reviewable than a court's will be, but in isolation this doesn't count for much -- it will be no less reviewable than any other decision made in arbitration, and the law generally favors arbitration of many high-stakes questions. See First Options, 514 U.S. at 945. In Stolt-Nielsen, reduced judicial review was a matter of concern only because of the increased liability of class proceedings. See Stolt-Nielsen, 559 U.S. at 687. Quite simply, the concerns raised in Stolt-Nielsen and Concepcion are not implicated by our decision today.

Against our conclusion that the class availability question must go to an arbitrator, JPay argues that the particular question of class availability ought to be treated differently from questions of arbitrability in general -- that "consent to arbitrate class arbitrability cannot be presumed 'by simply agreeing to submit' disputes over 'arbitrability' to an arbitrator." (quoting Stolt-Nielsen, 559 U.S. at 685). "[T]he particular question of class arbitration," JPay says, quoting the Eighth Circuit, "demand[s] a more particular delegation of the issue [to the arbitrator] than

39

we may otherwise deem sufficient." (quoting <u>Catamaran</u>, 864 F.3d at 973). JPay suggests that we ought to look for some more specific indicia that class arbitration was contemplated, something like "express reference to class arbitration, the availability of class arbitration, the Supplementary Rules, or who decides whether the arbitration agreement permits class arbitration." (quoting <u>Chesapeake Appalachia</u>, 809 F.3d at 759).

For starters, JPay's preferred rule is foreclosed by <u>Spirit Airlines</u>, which rejected just this argument, and by <u>Terminix</u>, which gave no indication that questions of arbitrability are treated as anything but a unitary category. In <u>Spirit Airlines</u>, the defendant argued "that we should demand a higher showing for questions of class arbitrability than for other questions of arbitrability," but we rejected this, "find[ing] no basis for that higher burden in Supreme Court precedent." <u>Spirit Airlines</u>, 2018 WL 3866335 at *3–4. Altogether consistent with <u>Spirit Airlines</u>, <u>Terminix</u> never required that the AAA rules that the parties say anything about any particular question of arbitrability in order for that question to be delegated. In <u>Terminix</u>, the defendant challenged the validity of the arbitration agreement, arguing that the parties' contracts were unenforceable because they limited remedies illegally. <u>Terminix</u>, 432 F.3d at 1329. The court did not look for an express contractual reference to the evaluation of the validity of an agreement. Rather, it treated this question of arbitrability as part of a unitary category of

questions of arbitrability. This category is not broken down into individual questions, and we need not look for a specific reference to the class availability question any more than we needed to look for a specific reference to "validity" or evaluation of remedial limitations in Terminix.

Moreover, a consistent body of case law has spoken of questions of arbitrability as a unitary category. There is no reason to consider whether any particular question of arbitrability is specifically delegated because the questions are typically delegated or preserved as a group. The Supreme Court has looked for delegation of arbitrability in general, rather than for an intent to delegate precise questions of arbitrability. E.g., Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68–69 (2010) ("The delegation provision is an agreement to arbitrate threshold issues . . . . [P]arties can agree to arbitrate 'gateway' questions of 'arbitrability.'" (emphases added)); First Options of Chi. Inc. v. Kaplan, 514 U.S. 938, 944 (1994) ("Courts should not assume the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." (alterations omitted) (emphasis added)). This Court has spoken of questions of arbitrability as a group as well. E.g., Spirit Airlines, 2018 WL 3866335 at *5 ("Florida's Arbitration Code reserves questions of arbitrability for courts."); Waffle House, 866 F.3d at 1267 ("The language clearly and unmistakably evinces the parties' intent to arbitrate all gateway issues." (emphasis added)).

41

Indeed, if we were to follow the logic of JPay's argument -- and our case precedent forbids us from travelling down that road -- and require something more than a general delegation of questions of arbitrability in order to delegate the question of class availability, contract-drafting would be made needlessly, if not impossibly, complex. If questions of arbitrability are not delegated as a group by default, we would need to distinguish which questions of arbitrability require special additional indicia of delegation, and which, if any, would be delegated through language delegating questions of arbitrability only in general. JPay might respond that class availability raises unique concerns, but we anticipate that other important considerations could be raised about any number of fundamental gateway questions of arbitrability. We agree that these are important questions, but their importance is accounted for by the default rule that they presumptively stay in the courts in the absence of a clear and unmistakable delegation. If, after finding a general delegation of questions of arbitrability, we were to require additional specific indicia of the delegation of particular questions of arbitrability, contracting parties hoping to delegate as much as possible would be burdened with explicitly listing and delegating as many questions of arbitrability as they could think of. Even then, if an unforeseen question of arbitrability later arose, parties who had hoped to arbitrate all questions of arbitrability might be forced into court against their will if a court, perhaps applying the canon of *expressio unius est*

42

*exclusio alterius*, reasoned that the explicit delegation of other questions implied that this new question was reserved for the court. We avoid any complications and unpleasant results by treating questions of arbitrability as a group unless an agreement gives us a reason to do otherwise. Finally, we reiterate that our aim in this analysis is only to give meaning to the parties' expressed will by applying the words they used, and remind future parties that they are free to draft using language as specifically or generally as they want.

## III.

To return to basics as we conclude, arbitration is a matter of contract and of consent. See Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013); Stolt-Nielsen, 559 U.S. at 681 (2010). JPay and its users contracted and consented to arbitrate "any and all . . . disputes, claims and controversies" arising out of or relating to JPay's Terms of Service, and they agreed to arbitrate the arbitrability of those claims. When parties ask whether an arbitration may be conducted on a class basis, they are asking whether a class-based claim -- a unique type of claim -- is arbitrable. Thus, the instant dispute poses a question of arbitrability, and JPay has agreed that this is a question to be answered in arbitration.

The district court lacked the power to decide whether or not the parties would arbitrate on a class basis. Although JPay says otherwise today, it agreed when drafting its Terms of Service that an arbitrator would decide this question.

43

The district court should have sent the dispute to arbitration and should not have passed on whether or not class proceedings were available.  We, therefore, VACATE the district court's order granting JPay's Cross Motion for Summary Judgment, REVERSE the order denying Kobel and Houston's Motion to Compel Arbitration, and REMAND with instructions that the Demand be referred to arbitration.

**VACATED in part, REVERSED in part, and REMANDED**

GRAHAM, District Judge, concurring in part and dissenting in part:

I agree wholeheartedly with the majority holding that the availability of class arbitration is a question of arbitrability, presumptively for a court to decide, and that courts cannot assume that parties would want these kinds of questions to be arbitrated unless an agreement evinces a clear and unmistakable intent to send them to arbitration. I also agree with the majority's finding that the arbitration agreement in this case expressly and by incorporation of specific rules of the American Arbitration Association (the "AAA") delegated issues of arbitrability to the arbitrator. But I disagree with the majority's conclusion that the language these parties used in their contract expressed a clear intent to permit the arbitrator to decide the question of the availability of class arbitration.

I believe that a general delegation to arbitrate issues of arbitrability is not enough and that without a specific reference to class arbitration the court should presume that the parties did not intend to delegate to an arbitrator an issue of such great consequence.

The arbitration agreement in this case makes no express reference to class arbitration or any other procedure for combining or consolidating multiple claims. It does contain a general delegation of the power to decide matters of arbitrability: "The ability to arbitrate the dispute, claim or controversy shall likewise be determined in the arbitration." And it refers to two specific rules of the AAA—the

45

Arbitration Rules for the Resolution of Consumer Related Disputes and the

Commercial Arbitration Rules—each of which includes a general delegation of the

power to decide issues of arbitrability: "The arbitrator shall have the power to rule

on his or her own jurisdiction, including any objections with respect to the

existence, scope, or validity of the arbitration agreement or to the arbitrability of

any claim or counterclaim."

Neither the express delegation clause nor the AAA rules make any reference

to class arbitration. In the absence of a reference to class claims it should be

presumed that the delegation of the power to determine arbitrability is limited to

the arbitrability of bilateral claims and controversies arising out of the contractual

relationship between the parties.

In *Terminix*, this Court construed an arbitration agreement that said, "the

arbitration shall be conducted in accordance with the Commercial Arbitration

Rules then in force of the [AAA]." *Terminix Int'l Co., LP v. Palmer Ranch Ltd.

P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005).  Those rules included this provision:

"[t]he arbitrator shall have the power to rule on his or her own jurisdiction,

including any objections with respect to the existence, scope or validity of the

arbitration agreement." *Id.* This Court held that this language was enough to give

the arbitrator the authority to determine the validity of the arbitration clause. *Id.*

The case involved a single plaintiff, Palmer Ranch, which claimed that Terminix

46

failed to properly perform termite protection services for its apartment complex. *Id.* at 1330. *Terminix*, unlike the present case, involved the authority of the arbitrator to determine his or her jurisdiction to decide the merits of a bilateral dispute arising out of the parties' commercial relationship.

A similar case from this Court likewise involved a dispute between two parties to an arbitration agreement, which provided that almost any dispute that arose between them under their commercial agreement would be arbitrated "under the rules of the [AAA]." *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1309 (11th Cir. 2014). Adhering to its holding in *Terminix*, the Court held that the arbitrator had the authority to determine arbitrability of that bilateral dispute. 769 F.3d at 1312.

In *Spirit Airlines*, this Court addressed for the first time the issue of the authority of an arbitrator to decide whether an arbitration agreement permitted class arbitration, finding that the arbitration agreement in that case did confer such authority upon the arbitrator. *Spirit Airlines, Inc. v. Maizes*, No. 17-14415, 2018 WL 3866335 (11th Cir. Aug. 15, 2018). The arbitration agreement in *Spirit Airlines* referred in general to "the Rules of the American Arbitration Association." *Id.* at *4. The Court in *Spirit Airlines* relied on one of those sets of rules, to wit, the Supplementary Rules for Class Arbitrations, which include Supplementary Rule 3

47

which "provides that an arbitrator shall decide whether an arbitration clause permits class arbitration." *Id.* at *3.

In contrast, the arbitration agreement in this case refers to two very specific rules of the AAA that will govern the parties' disputes: the "Arbitration Rules for the Resolution of Consumer Related Disputes" and "Commercial Arbitration Rules." Significantly, absent in either of these two sets of rules is any reference to the Supplementary Rules for Class Arbitrations. There is one general reference to the rules of the AAA in JPay's arbitration agreement, but its context is quite unlike the all-inclusive language in *Spirit Airlines*. JPay's arbitration agreement says, "The arbitration proceedings shall be conducted in as expedited a manner as is then permitted by the rules of the [AAA]." Any suggestion that this general reference was intended to adopt by reference the Supplemental Rules for Class Arbitration would be absurd—class arbitration could hardly be considered expeditious. The lack of a general reference to the rules of the AAA that could be reasonably construed to reference class arbitration makes JPay's arbitration agreement factually distinguishable from the agreement in *Spirit Airlines*.

I conclude that none of the Eleventh Circuit cases cited by the majority are controlling here. In *Spirit Airlines* the Court relied on a specific reference to class arbitration in the AAA Supplemental Rules for Class Arbitrations. Without such specificity, a court should presume that a general delegation of the power to decide

48

questions of arbitrability does not include the power to construe an arbitration agreement to permit class arbitration.

My conclusions are driven by the immense differences between adjudication of bilateral disputes and the conduct of class action proceedings. Other courts, including the Supreme Court of the United States, have enumerated some of these significant differences, including the duration, complexity, inefficiency, and expense of class proceedings, vastly increased potential liability, lack of confidentiality, and limited scope of judicial review.[1]

The majority relies heavily on these considerations in deciding that the availability of class arbitration is a question of arbitrability for a court to decide. But it refuses to consider them when deciding whether the parties in this case intended to let the arbitrator decide if their agreement permits him or her make that call. That is puzzling because that inquiry is an inquiry into the parties' intent and ordinarily a court considers consequences in determining what the parties intended. I believe the court should consider the consequences in deciding whether the

---

[1] Another factor a court might want to consider in deciding whether the parties intended to let the arbitrator make the call is the stake the arbitrator has in the outcome. Arbitration is no longer a cottage industry; it is big business. Deborah Rothman, *Trends in Arbitrator Compensation*, Dispute Resolution Magazine, Spring 2017, at 8 (noting rates for arbitrators may exceed $1,000 an hour), available at https://www.americanbar.org/content/dam/aba/publications/dispute_resolution_magazine/spring 2017/3_rothman_trends_in_arbitrator.authcheckdam.pdf. Arbitrators charge substantial fees and vigorously compete for business. Transforming a simple bilateral dispute into a class action, which may require months or years of full-time work, might tax an arbitrator's impartiality.

parties' general delegation of the authority to decide arbitrability was intended to include the important issue of the arbitrability of class claims. The consequences of transforming a bilateral arbitration into a fundamentally different type of proceeding supports the proposition that the arbitrator's power to do so should not be inferred from a general delegation to decide issues of arbitrability. The principles of *Howsam* should likewise apply here. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("[A] disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court.").[2]

I find some support for my views in several other circuit court decisions. *See, e.g.*, *Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 973 (8th Cir. 2017) ("The risks incurred by defendants in class arbitration . . . and the difficulties presented by class arbitration . . . all demand a more particular delegation of the

---

[2] The majority also holds that the significance of the delegation clause, "[a]t the absolute least . . . would have been obvious to the JPay attorneys who drafted the Terms of Service." *Ante* at 32. I disagree. The implication here is that the majority would hold ambiguity against the drafters. It's true that many states have adopted the rule of construing ambiguous terms in a contract against the drafter. But our context demands "clear and unmistakable" language, *Howsam*, 537 U.S. at 83, a standard stood on its head if a court applies the construe-ambiguity-against-the-drafter canon, *see Chesapeake Appalachia*, 809 F.3d at 763 (refusing to construe ambiguity against the drafter because of the clear-and-unmistakable standard). The Supreme Court is set to resolve this question: "Whether the Federal Arbitration Act forecloses a state-law interpretation of an arbitration agreement that would authorize class arbitration based solely on general language commonly used in arbitration agreements." *Lamps Plus, Inc. v. Varela*, 2018 WL 389119 (U.S.) (cert. petition); *see Varela v. Lamps Plus, Inc.*, 701 F. App'x 670, 673 (9th Cir. 2017), *cert. granted,* 138 S. Ct. 1697, 200 L. Ed. 2d 948 (2018).

issue than we may otherwise deem sufficient in bilateral disputes."); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 764–65 (3d Cir. 2016) ("Given these considerations, it is conceivable that [the parties] may have agreed to the Leases because they intended to delegate questions of bilateral arbitrability to the arbitrators—as opposed to the distinctive question of whether they thereby agreed to a fundamentally different type of arbitration not originally envisioned by the FAA itself."); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) ("But given the total absence of any reference to classwide arbitration in this clause, the agreement here can just as easily be read to speak only to issues related to bilateral arbitration. Thus, at best, the agreement is silent or ambiguous as to whether an arbitrator should determine the question of classwide arbitrability; and that is not enough to wrest that decision from the courts.").

I would also note that in *Oxford Health* the arbitration agreement incorporated the rules of the AAA, and nevertheless at least two of the Justices felt that was not sufficient to authorize the arbitrator to decide whether to conduct class arbitration. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 574 (Alito, J., concurring) (joined by Justice Thomas) ("But unlike petitioner, absent members of the plaintiff class never conceded that the contract authorizes the arbitrator to decide whether to conduct class arbitration. It doesn't.").

I would affirm the district court's decision that the arbitration agreement in this case does not permit the arbitrator to decide whether the agreement permits class arbitration.