[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13575

_____

WILLIAM ATTIX,
on behalf of himself and all others similarly situated,

Plaintiff-Appellee,

*versus*

CARRINGTON MORTGAGE SERVICES, LLC,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-22183-UU

_____

Before BRANCH, GRANT, and BRASHER, Circuit Judges.

BRANCH, Circuit Judge:

Parties often agree to arbitrate disputes arising from their contracts. They may arbitrate all kinds of disputes, including whether their claims are arbitrable. In other words, parties are free to arbitrate not only the "merits" of their claims, but also the "arbitrability" of their claims. But—wait for it—parties sometimes dispute whether an arbitrator should arbitrate arbitrability. When that happens, a *court* must decide *who* decides whether the parties will arbitrate. This is one such case.

In May 2020, William Attix sued his mortgage servicer, Carrington Mortgage Services, asserting claims under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, and Florida law. Attix's claims arose from a mortgage payment he made to Carrington using an automated pay-by-phone service provided by Speedpay, a third-party payment service provider. Before making his mortgage payment, Attix agreed to be bound by Speedpay's terms and conditions. Those terms and conditions—to which Attix, Speedpay, *and* Carrington were parties—provided that "any dispute arising from" Attix's use of Speedpay's service "shall be" arbitrated. They also provided that an "arbitrator shall also decide what is subject to arbitration unless prohibited by law," and incorporated by reference an arbitration provision of the American Arbitration Association ("AAA") stating that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction."

After Attix filed suit, Carrington moved to compel arbitration. Carrington argued that Attix's claims arose from his use of Speedpay's service and therefore must be arbitrated under the terms and conditions to which Attix had agreed. Carrington also argued that, by agreeing that an arbitrator would decide "what is subject to arbitration" and would "rule on his or her own jurisdiction," the parties had contracted to arbitrate any disputes about whether Attix's claims were arbitrable. Attix conceded that he had agreed to arbitrate claims arising from his use of Speedpay's service, including the claims he had asserted against Carrington, but argued that a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), Pub. L. No. 111-203, 124 Stat. 1376, prohibited enforcement of the parties' arbitration agreement.

The district court denied Carrington's motion to compel arbitration. The district court found that the parties had entered into a valid agreement to arbitrate claims arising from Attix's use of Speedpay's service and that Attix's claims against Carrington were covered by that agreement. But the district court ruled that the Dodd-Frank Act prohibited enforcement of the parties' arbitration agreement. The district court noted the provision of the Speedpay terms and conditions directing that an arbitrator decide "what is subject to arbitration," but said that provision had no application in this case.

On appeal, Carrington challenges the district court's denial of its motion to compel arbitration on two grounds. First,

Carrington argues that the district court erred in even deciding whether the Dodd-Frank Act prohibits enforcement of the parties' arbitration agreement.  Carrington asserts that, by agreeing that an arbitrator would decide "what is subject to arbitration" and would "rule on his or her own jurisdiction," the parties agreed that an arbitrator would decide such threshold arbitrability issues.  Second, Carrington argues that, in any case, the district court erred in finding that the Dodd-Frank Act prohibits enforcement of the parties' arbitration agreement.

Carrington is right on the first point, which means the second is not for us to decide.  In the terms and conditions governing Attix's use of Speedpay's service, Attix and Carrington clearly and unmistakably agreed that an arbitrator would decide all threshold questions about the arbitrability of Attix's claims, including whether their arbitration agreement is enforceable.  Attix argues that the parties agreed to arbitrate only some, but not all, threshold arbitrability issues, but his interpretation of the parties' agreement is unavailing.  Moreover, although he claims that he has, Attix has not specifically challenged the enforceability of the parties' agreement to arbitrate threshold questions about the arbitrability of his claims.  Attix's Dodd-Frank Act challenge relates only to the enforceability of the parties' separate agreement to arbitrate the *merits* of his claims, and the parties have agreed to submit questions about the enforceability of *that* agreement to an arbitrator.  Thus, the arbitrability dispute in this case—*i.e.,* whether

the Dodd-Frank Act prohibits enforcement of the parties' arbitration agreement—is for an arbitrator to decide.

After review and with the benefit of oral argument, we reverse and remand with instructions to compel arbitration and stay proceedings in the district court.

## I.    Background

In 2008, William Attix took out a home mortgage loan. Later, after Attix defaulted, Carrington became his mortgage servicer.   In May 2020, Attix made a mortgage payment to Carrington using Speedpay's automated phone payment service. When Attix dialed Speedpay's line, Speedpay's automated system informed him that he would be charged a $10 convenience fee for using Speedpay's service.   Through a telephonic prompt, Attix agreed to pay the $10 fee.

Before Attix completed his mortgage payment, Speedpay's automated system informed him that "the terms and conditions applicable to this payment are located at Speedpay.com/terms," and directed Attix to press 1 "to complete your transaction and accept these terms."  The applicable terms and conditions located on Speedpay's website stated:

> THIS PAYMENT SERVICE IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS.
>
> Do not use or access this Website or Service if You do not agree to be bound by these Terms and Conditions.

These Terms and Conditions ("Terms and Conditions") are in effect for all transactions processed through this payments website ("Website") on or after May 9, 2019, and apply to and govern Your access to and use of this Website, the Service and all Alternative Channels. This payment processing service is offered to You on behalf of your Biller ("Service").

. . . These Terms and Conditions also apply to Service transactions, or Payments, made by or through any "Alternative Payment Channels" including those Payments initiated, or completed through, Integrated Voice Response (IVR) systems, customer service representatives, telephone, internet, or any other means or mechanisms of Payment acceptance.

The Speedpay terms and conditions defined "User," "You," and "Your" as "a user of this Website or any Alternative Payment Channel, located in the U.S., who is making a payment to the Biller." They defined "Speedpay" as "Speedpay, an ACI Worldwide company, and, as applicable, its affiliates and parent company who support the Service." And they defined "Biller" as "the receiver of Your Payment, which is generally a business that is a client of Speedpay that has authorized Speedpay to process Payments from its customers."[1]

---

[1] The parties agree that, when Attix made his mortgage payment using Speedpay's service, Carrington was the "Biller."

20-13575                Opinion of the Court                    7

The Speedpay terms and conditions contained the following arbitration provision:

> Unless You opt out as set forth below, any dispute arising from or relating to Service or your Payment(s) shall be resolved by mandatory and binding arbitration. The arbitrator shall also decide what is subject to arbitration unless prohibited by law. The arbitration will be administered by American Arbitration Association ("AAA") under its Consumer Arbitration Rules, which are available at https://www.adr.org/active-rules. You will be responsible for up to $200 of the administration fees. We, or the Arbitrator, may reduce this amount if you demonstrate hardship. This agreement is governed by the Federal Arbitration Act[,] 9 U.S.C. § 1 et seq. ("FAA"), and any award shall be final and binding, and may be entered as judgment in any court of competent jurisdiction. Any arbitration shall take place on an individual basis; class actions or consolidation of arbitrations are not permitted. The Arbitrator shall be required to follow applicable substantive law and shall have no authority to deviate therefrom. If any part of this paragraph is deemed invalid, it shall not invalidate the other parts. If AAA is unwilling or unavailable to administer the arbitration, the parties or a court will select another arbitrator in accordance with the FAA. You may opt out of arbitration within 30 days after initiating a Payment by calling (866) 316-3360. IF YOU DO NOT OPT OUT, YOU WILL WAIVE ANY RIGHT TO A

TRIAL BY JURY OR JUDGE IN COURT AND ANY RIGHT TO PARTICIPATE IN A CLASS ACTION.[2]

(emphasis omitted).

The "Consumer Arbitration Rules" that the arbitration provision referenced are a publicly available set of AAA rules for arbitrating disputes arising from consumer contracts with standardized arbitration clauses. *See* American Arbitration Association, *Consumer Arbitration Rules* 6 (amended and effective Sept. 1, 2014), adr.org/sites/default/files/Consumer-Rules-Web.pdf. Arbitrations that proceed under the Consumer Arbitration Rules are administered by the AAA and conducted by a neutral arbitrator selected by either the parties or the AAA. *See id.* R-1, R-15, R-16. Rule 14 of the Consumer Arbitration Rules—the "Jurisdiction" section—provides that:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

*Id.* R-14(a).

On May 26, 2020—just a few days after he used Speedpay's service to make his mortgage payment—Attix filed a putative class action suit against Carrington, asserting claims under the FDCPA and Florida law. Attix alleged that Carrington violated those laws

---

[2] Attix did not opt out of arbitration.

by using its payment service provider to collect convenience fees for mortgage payments made online or over the phone and then retaining some or all of those convenience fees for itself.[3]

After Attix filed suit, Carrington moved to compel arbitration and stay proceedings in the district court. In its motion, Carrington argued that Attix and Carrington were parties to the terms and conditions governing Attix's use of Speedpay's service to make his mortgage payment in May 2020; that Attix's claims arose from his use of Speedpay's service; and that Attix's claims were therefore governed by the parties' agreement to arbitrate "any dispute arising from or relating to Service or your Payment(s)." Carrington also argued that, by agreeing that "[t]he arbitrator shall also decide what is subject to arbitration unless prohibited by law," and by incorporating the AAA's rules for consumer arbitrations into their agreement, the parties had agreed to "delegate" any disputes about the arbitrability of Attix's claims to an arbitrator. In

---

[3] Although the substantive details of Attix's claims are not relevant to this appeal, by way of background, Attix alleged in his class action complaint that, by collecting and retaining convenience fees for mortgage payments made online or over the phone, Carrington violated the FDCPA's prohibition against "debt collector[s]" collecting fees incidental to principal debt obligations that are not "expressly authorized by the agreement creating the debt or permitted by law." See 15 U.S.C. § 1692f(1). In his state-law counts, Attix alleged that, when it collected and retained convenience fees, Carrington also: (1) violated two Florida consumer protection statutes; and (2) breached the terms of Attix's mortgage loan agreement or, in the alternative, was unjustly enriched.

response, Attix argued that the parties' agreement to arbitrate his claims arising from his use of Speedpay's service "violate[d] the Dodd-Frank Act," which "prohibits the use of arbitration provisions or pre-dispute waivers of federal statutory causes of action in connection with residential mortgages."

The district court denied Carrington's motion to compel arbitration. The district court made several findings that, on appeal, are undisputed: (1) Carrington was a party to the terms and conditions governing Attix's use of Speedpay's service to make his mortgage payment in May 2020; (2) in those terms and conditions, the parties entered into a valid agreement to arbitrate claims "arising from or relating to" Attix's use of Speedpay's service; and (3) Attix's claims against Carrington arose from his use of Speedpay's service and fell within the scope of the parties' arbitration agreement. Even so, the district court denied Carrington's motion, finding that 15 U.S.C. § 1639c—a provision of the Dodd-Frank Act setting out "minimum standards for residential mortgage loans"—"prohibit[ed] arbitration" of Attix's claims. Subsection (e)(3) of that statute provides:

> No provision of any residential mortgage loan or of any extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer, and no other agreement between the consumer and the creditor relating to the residential mortgage loan or extension of credit referred to in

paragraph (1),[4] shall be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States, or any other court of competent jurisdiction, pursuant to section 1640 of this title or any other provision of law, for damages or other relief in connection with any alleged violation of this section, any other provision of this subchapter, or any other Federal law.

15 U.S.C. § 1639c(e)(3). The district court found that § 1639c(e)(3) prohibited arbitration of Attix's claims arising from his use of Speedpay's service to make his mortgage payment to Carrington. In reaching that conclusion, the district court found that, under the statute: (1) Attix was a "consumer"; (2) Carrington was a "creditor"; and (3) the terms and conditions governing Attix's use of Speedpay's service were an "agreement" between Attix and Carrington "relating to" Attix's residential mortgage loan. Accordingly, the district court found that the Speedpay terms and conditions were an "agreement between [a] consumer and [a] creditor relating to [a] residential mortgage loan" under

---

[4] "Paragraph (1)" is 15 U.S.C. § 1639c(e)(1), a related provision that states:

No residential mortgage loan and no extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction.

15 U.S.C. § 1639c(e)(1). Section 1639c(e)(1) is not at issue in this case.

§ 1639c(e)(3).    And, the district court ruled that, because § 1639c(e)(3) states that such agreements "shall [not] be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States," the statute prohibited arbitration of Attix's claims.

Finally, the district court noted that the parties had agreed, in the "delegation" clause of the Speedpay terms and conditions, that an "arbitrator shall also decide what is subject to arbitration unless prohibited by law."    But the district court declined to consider whether questions about the arbitrability of Attix's claims were committed to an arbitrator's review under that provision, finding that "there [was] no bona fide dispute as to the scope of the [parties'] arbitration agreement."

Carrington timely appealed from the district court's denial of its motion to compel arbitration.[5]

_____

[5] After Carrington filed its notice of appeal, it filed a motion in the district court to stay proceedings in that court pending appeal. *See Blinco v. Green Tree Servicing, LLC*, 366 F.3d 1249, 1253 (11th Cir. 2004) ("When a litigant files a motion to stay litigation in the district court pending an appeal from the denial of a motion to compel arbitration, the district court should stay the litigation so long as the appeal is non-frivolous.").    In that motion, Carrington argued, among other things, that the district court's decision to disregard the "delegation" clause in the Speedpay terms and conditions "conflict[ed] with controlling Supreme Court precedent requiring courts to rigorously enforce delegation clauses," and that the district court had erred in deciding whether the Dodd-Frank Act prohibited arbitration of his claims, rather than compelling arbitration so that an arbitrator could decide that issue.

20-13575                Opinion of the Court                13

## II.    Standard of Review

We review the denial of a motion to compel arbitration de novo. *Jenkins v. First Am. Cash Advance of Ga.*, 400 F.3d 868, 873 (11th Cir. 2005).

## III.   Discussion

In this appeal, we determine whether an arbitrator must decide if the parties' agreement to arbitrate claims arising from Attix's use of Speedpay's service is enforceable under the Dodd-

---

The district court denied Carrington's motion to stay proceedings pending appeal. As to Carrington's argument that it had erred in deciding whether the Dodd-Frank Act prohibited arbitration of his claims, the district court said:

> Defendant argues that the appeal is non-frivolous because the [parties'] Arbitration Agreement [in the Speedpay terms and conditions] contained a delegation clause and under Supreme Court precedent, a court may not decide an arbitrability question that the parties have delegated to an arbitrator. But this argument ignores Dodd-Frank. The delegation clause [in the Speedpay terms and conditions] provides that "[t]he arbitrator shall also decide what is subject to arbitration *unless prohibited by law*." The delegation clause therefore evinces a clear intent for the Court, not the arbitrator, to determine whether arbitration of any claims is "prohibited by law," which is precisely what the Court did in this case.

(quotation and citations omitted; emphasis in original).

After the district court denied Carrington's motion to stay proceedings pending appeal, Carrington moved in this Court for the same relief. We found that Carrington's appeal is not frivolous and granted Carrington's motion to stay proceedings in the district court in a summary order.

Frank Act. Carrington argues that, in the Speedpay terms and conditions, the parties clearly and unmistakably agreed to delegate questions about the arbitrability of Attix's claims to an arbitrator, including questions about whether the parties' agreement to arbitrate those claims is enforceable. In response, Attix challenges the scope of the parties' delegation agreement, arguing that the parties agreed to delegate some, but not all, questions of arbitrability to an arbitrator. Attix also argues that his statutory challenge based on the Dodd-Frank Act represents a "specific challenge" to the enforceability of the parties' agreement to delegate threshold arbitrability issues.[6]

We find that, in the Speedpay terms and conditions, Attix and Carrington clearly and unmistakably agreed to delegate *all* questions of arbitrability to an arbitrator, including the arbitrability dispute in this case—*i.e.*, whether the parties' agreement to arbitrate Attix's claims is enforceable under the Dodd-Frank Act. Moreover, Attix's Dodd-Frank Act challenge relates only to the enforceability of the parties' agreement to arbitrate the *merits* of his claims, not the enforceability of the parties' separate agreement to arbitrate the *arbitrability* of his claims, and is therefore an issue for the arbitrator to decide. Thus, we enforce the parties'

---

[6] The second issue in this appeal is whether the Dodd-Frank Act prohibits enforcement of the parties' agreement to arbitrate Attix's claims. Because we resolve the first issue in this appeal in Attix's favor, we do not reach the second issue, which is for an arbitrator to decide.

agreement as written and direct the district court to compel arbitration.

We begin with settled principles of law.  The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The FAA "reflect[s] both a liberal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation and quotations omitted).  "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms."  *Id.* (citation omitted).  Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

The FAA "also establishes procedures by which federal courts implement [its] substantive rule."  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010).  A party to an arbitration agreement may move "for an order directing that such arbitration proceed in the manner provided for in such agreement" under § 4

of the FAA, and for a stay of proceedings in federal court pending the outcome of arbitration under § 3.[7]  *See* 9 U.S.C. §§ 3–4.  Before enforcing an arbitration agreement, the court should ensure that the agreement was formed and that it applies to the dispute at hand.  *See id.* § 4 (the court must compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue"); *id.* § 3 (the court must stay proceedings in federal court "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement").  The court should also determine whether, under § 2, there are any "'grounds as exist at law or in equity for the revocation of any contract'" that "invalidat[e]" the arbitration agreement or "permit[] [it] . . . to be declared unenforceable."  *Concepcion*, 563 U.S. at 339 (quoting 9 U.S.C. § 2).  If the parties' arbitration agreement applies to their dispute and no grounds render it invalid or unenforceable, the court "shall" compel arbitration and stay proceedings in federal court.  9 U.S.C. §§ 3–4.

---

[7] The FAA's provisions "do not themselves support federal jurisdiction." *Badgerow v. Walters*, 142 S. Ct. 1310, 1316 (2022); *cf. id.* at 1315–18 (describing how, when a defendant presents a standalone petition to compel arbitration in federal court under § 4 of the FAA, the district court may "look through" to the "underlying substantive dispute" to assess its jurisdiction).  In this case, there is no dispute that the federal courts have subject-matter jurisdiction. Carrington moved to compel arbitration after Attix asserted an FDCPA claim raising a federal question.  *See* 28 U.S.C. § 1331.

The classic arbitration agreement is an agreement to arbitrate any claims arising from a contract between two parties. *See, e.g.*, *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1214–15 (11th Cir. 2011) (addressing an agreement to arbitrate "any and all disputes, claims, or controversies whatsoever . . . relating to or in any way arising out of or connected with" an employment contract). In other words, the classic arbitration agreement is an agreement to arbitrate the "merits" of the parties' claims if a dispute later arises between them. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527, 529 (2019). These agreements to arbitrate are typically nested within the parties' larger contract, which may involve employment, goods or services, insurance, or another type of transaction. *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442–43 (2006) (construing an arbitration agreement contained within a contract for check cashing services).

Sometimes, parties agree not only to arbitrate the merits of any claims that arise from their contract, but also to arbitrate any "threshold" or "gateway" questions about the "arbitrability" of those claims, such as questions about the "enforceability, scope, [or] applicability" of the parties' agreement to arbitrate their claims. *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017). By default, a court would normally decide threshold disputes about whether a party's claims are arbitrable. *See U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) ("[O]rdinarily, the question of arbitrability is undeniably

an issue for judicial determination." (quotation omitted and alteration adopted)).    But parties are free to have an arbitrator decide their threshold disputes instead.  *See Henry Schein*, 139 S. Ct. at 527 ("[P]arties [may] agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions.").

An agreement to arbitrate threshold arbitrability issues is often called a "delegation" agreement, because it delegates the resolution of disputes about the arbitrability of the parties' claims to an arbitrator.  *See Rent-A-Center*, 561 U.S. at 68.  A delegation agreement "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Id.* at 70; *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019) ("A delegation clause is merely a specialized type of arbitration agreement.").    As with any arbitration agreement, before enforcing a delegation agreement, the court should ensure that the agreement was formed, that it applies to the dispute at hand, and that no grounds render it invalid or unenforceable.[8]  *See Rent-A-Center*, 561 U.S. at 69 (citing 9 U.S.C. §§ 2–4).

---

[8] Although it is the court's obligation to determine, before enforcing a delegation agreement, that no grounds render the delegation agreement invalid or unenforceable, *see* 9 U.S.C. § 2, it is the parties' obligation to tell the court what those grounds might be.  In other words, it is up to the parties to specifically challenge the delegation agreement's validity or enforceability. *See Rent-A-Center*, 561 U.S. at 70–72.  More on that later.

Further, when analyzing whether the parties to a contract have agreed to arbitrate threshold questions of arbitrability, we "reverse[]" the FAA's standard "presumption" favoring arbitration. *JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotation omitted). Thus, unlike with agreements to arbitrate the merits of the parties' claims arising from their contract, we resolve ambiguities in an agreement to arbitrate questions about the arbitrability of those claims in favor of the party opposing arbitration. *See id.* at 944–45. However, if the court finds that the parties have clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator, it "must respect the parties' decision as embodied in the contract." *Henry Schein*, 139 S. Ct. at 531. "Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." *Id.* at 530.

Until recently, certain courts routinely decided questions of arbitrability themselves, even when the parties had agreed to delegate those questions to an arbitrator, if the courts found that the arguments in favor of requiring arbitration of the parties' claims were "wholly groundless." *See id.* at 527–28. In *Henry Schein*, the Supreme Court struck down this "wholly groundless" exception to the FAA, noting that it "short-circuit[s] the process" to which the

parties have agreed. *Id.* The Court made clear that the FAA leaves no room for such judicial maneuvers:

> We must interpret the [Federal Arbitration] Act as written, and the Act in turn requires that we interpret the contract as written. When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.

*Id.* at 529.

With these principles of law in mind, we proceed to our analysis of whether an arbitrator should decide if the parties' agreement to arbitrate claims arising from Attix's use of Speedpay's service is enforceable under the Dodd-Frank Act. We analyze this issue in two parts. First, we consider whether the parties clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator. We find that they did. Second, we consider whether Attix has specifically challenged the enforceability of the parties' delegation agreement. We find that he has not. Thus, we enforce the parties' delegation agreement as written and compel arbitration.

### A. The Parties Clearly and Unmistakably Agreed to Delegate Questions of Arbitrability to an Arbitrator

We first consider whether Attix and Carrington clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator. We find that they did. In two separate provisions of the

Speedpay terms and conditions—an express delegation clause and an incorporation of the AAA's rules for consumer arbitrations—the parties clearly and unmistakably agreed to delegate questions of arbitrability. Attix challenges the scope of the parties' delegation agreement, arguing that the parties agreed to delegate only some questions of arbitrability to an arbitrator, but not others. But Attix's reading of the parties' delegation agreement is unnatural, ungrammatical, and contrary to the normal way that delegation agreements function. By its plain terms, the parties' delegation agreement sends *all* questions of arbitrability to an arbitrator, including the arbitrability dispute in this case.

We start with the text of the arbitration section in the Speedpay terms and conditions. In relevant part, that section states:

> [A]ny dispute arising from or relating to Service or your Payment(s) shall be resolved by mandatory and binding arbitration. The arbitrator shall also decide what is subject to arbitration unless prohibited by law. The arbitration will be administered by American Arbitration Association ("AAA") under its Consumer Arbitration Rules, which are available at https://www.adr.org/active-rules.

(emphasis omitted).

Each sentence in this paragraph is significant. In the first sentence—"any dispute arising from or relating to Service or your Payment(s) shall be resolved by mandatory and binding

arbitration"—the parties agreed to arbitrate Attix's claims arising from his use of Speedpay's service. There is no dispute about what this provision means or its application in this case. On appeal, the parties agree that, in this provision, they agreed to arbitrate Attix's claims arising from his use of Speedpay's service, including the claims Attix has asserted against Carrington in this suit.

The second and third sentences—a clause directing that an arbitrator "shall also decide what is subject to arbitration," followed by an incorporation of the AAA's rules for consumer arbitrations—constitute the parties' delegation agreement. In each of these two provisions, Attix and Carrington clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator. Attix does not dispute that the parties agreed to delegate at least some questions of arbitrability. However, he disputes the scope of the parties' delegation agreement, arguing that the parties agreed to send most, but not all, questions of arbitrability to an arbitrator. Below, we construe first the parties' agreement that an arbitrator "shall also decide what is subject to arbitration"—*i.e.*, their "express" delegation clause—and then construe the parties' incorporation of the AAA rules. We then evaluate, and reject, Attix's assertion that the parties agreed to delegate only some questions of arbitrability. In fact, the parties clearly and unmistakably agreed to delegate *all* questions of arbitrability.

First, we consider the parties' express delegation clause. The Speedpay terms and conditions state: "The arbitrator shall also decide what is subject to arbitration unless prohibited by law."

This provision contains classic delegation language. By committing issues about "what is subject to arbitration" to an arbitrator's review, the provision clearly and unmistakably sends threshold arbitrability disputes to an arbitrator instead of a court. We have previously interpreted similar contract language providing that an arbitrator would decide "[a]ny issue regarding whether a particular dispute or controversy is . . . subject to arbitration" as an agreement to delegate questions of arbitrability to an arbitrator. *See Given v. M&T Bank Corp.*, 674 F.3d 1252, 1255–56 (11th Cir. 2012) (finding that, by agreeing to arbitrate issues about "whether a particular dispute or controversy is . . . subject to arbitration," the parties agreed to arbitrate threshold questions about "whether the arbitration agreement covers a particular controversy" and "whether [the] claims are within the scope of the arbitration agreement" (quotation omitted and alterations adopted)); *see also Jones*, 866 F.3d at 1267 (noting that the provision in *Given* "manifested a clear and unmistakable intent to arbitrate gateway issues" (citing *Given*, 674 F.3d at 1255)).

Next, we consider the parties' incorporation of the AAA rules for consumer arbitrations. The Speedpay terms and conditions state: "The arbitration will be administered by American Arbitration Association ("AAA") under its Consumer Arbitration Rules, which are available at https://www.adr.org/active-rules." Rule 14(a) of the AAA's Consumer Arbitration Rules—the "Jurisdiction" section—provides:

The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

By incorporating this AAA rule about the arbitrator's "power to rule on his or her own jurisdiction" into their agreement, Attix and Carrington clearly and unmistakably agreed to arbitrate threshold arbitrability disputes. We do not interpret this provision in first light. We have seen this precise language before, holding, in at least two prior cases, that an "incorporation of AAA rules giving an arbitrator the power to rule on his or her own jurisdiction constitutes a clear and unmistakable delegation of questions of arbitrability." *JPay*, 904 F.3d at 937–39 (interpreting identical language in two sets of AAA rules "as clearly and unmistakably evincing an intent to delegate questions of arbitrability"); *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (stating that, by incorporating identical language in the AAA's rules for commercial arbitrations into their agreement, "the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid"). In fact, we have held that incorporating the AAA's jurisdictional rules into an agreement constitutes clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability even if no other delegation language appears elsewhere in the contract. *See JPay*, 904 F.3d at 939, 942 ("[E]ither JPay's incorporation of AAA rules or its express delegation clause

would have been enough, on its own, to delegate the question of [arbitrability at issue].”). Here, of course, clear delegation language does appear elsewhere in the parties' agreement. Thus, in two separate provisions of their agreement—an express delegation clause and an incorporation of the AAA rules for consumer arbitrations—Attix and Carrington clearly and unmistakably agreed to submit questions of arbitrability to an arbitrator.

We now consider Attix's challenge to the scope of the parties' delegation agreement. Attix does not dispute that, in both the express delegation clause and the incorporation of the AAA rules for consumer arbitrations, the parties agreed to delegate questions of arbitrability to an arbitrator. However, Attix argues that the delegation has limited scope, and that it does not apply to the arbitrability dispute in this case.

Attix bases his challenge to the scope of the parties' delegation agreement on the language of the parties' express delegation clause. That clause states, again, that "[t]he arbitrator shall also decide what is subject to arbitration unless prohibited by law." Attix argues that we should read this provision as sending questions of arbitrability to an arbitrator, *except* for questions about whether arbitration of the parties' claims is "prohibited by law." The district court read the delegation clause the same way, taking the view that the clause "evince[d] a clear intent for the Court, not the arbitrator, to determine whether arbitration of any claims is 'prohibited by law.'" In essence, Attix asserts that the parties' delegation clause represents a "partial" delegation of most,

but not all, questions of arbitrability to an arbitrator—and, critically, that it does not delegate the arbitrability dispute in this case, namely whether the Dodd-Frank Act prohibits enforcement of the parties' agreement to arbitrate Attix's claims.

To understand Attix's "partial delegation" interpretation of the parties' delegation clause, some background on the different types of arbitrability issues is in order. Arbitrability issues involve "fundamental questions that will determine whether a claim will be brought before an arbitrator." *JPay*, 904 F.3d at 930. However, questions of arbitrability do not come in only one shape. There are a few basic kinds. Some arbitrability questions are about the "scope" or "applicability" of the parties' arbitration agreement— *i.e.*, what set of disputes the arbitration agreement covers, and whether it governs the particular dispute at hand. *See, e.g.*, *Henry Schein*, 139 S. Ct. at 528 (discussing an arbitrability dispute about whether an agreement to arbitrate claims, "except for actions seeking injunctive relief," required arbitration of the plaintiff's claims seeking injunctive relief "only in part"); *Princess Cruise Lines*, 657 F.3d at 1213–15, 1219–21 (analyzing whether a former cruise line employee's tort and maritime claims "f[e]ll within the scope of the arbitration provision"). Other arbitrability questions are about the "validity" or "enforceability" of an arbitration agreement—*i.e.*, whether the parties have entered into a legally

operative arbitration agreement that is enforceable under law.[9] *See, e.g., Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367–68, 1377–79 (11th Cir. 2005) (analyzing whether an arbitration agreement was unconscionable, and therefore unenforceable, under Georgia contract law); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 27–35 (1991) (considering whether the Age Discrimination in Employment Act (ADEA) prohibited enforcement of an agreement to arbitrate the plaintiff's age-discrimination claims). Everyone agrees that the arbitrability dispute in this case—whether the Dodd-Frank Act

---

[9] Although we need not delve deeply into the distinction between the validity and enforceability of an arbitration agreement in this appeal, we note that there appears to be a subtle, but material, distinction between the two concepts. Validity, the Supreme Court has indicated, is about "what it takes to enter into" a legally operative arbitration agreement. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1428 (2017); *see also id.* (noting that "duress" issues, which "involve[] unfair dealing at the contract formation stage," relate to an arbitration agreement's "initial validity" (quotations omitted and alteration adopted)). And enforceability is about whether the law allows for the enforcement of a validly formed arbitration agreement. *See id.* (contrasting rules "finding arbitration contracts invalid because improperly formed" and rules "refusing to enforce those agreements once properly made").

We leave an in-depth examination of the differences between validity and enforceability for another day. Whatever the precise demarcation may be, there is no dispute that the arbitrability issue in this case is about enforceability. On appeal, Attix does not challenge the district court's finding that, in the Speedpay terms and conditions, Attix and Carrington entered into a valid agreement to arbitrate his claims. Instead, Attix asserts that the parties' agreement to arbitrate his claims is unenforceable under the Dodd-Frank Act.

prohibits enforcement of the parties' agreement to arbitrate Attix's claims—is a question about the "enforceability" of the parties' arbitration agreement.[10]

With this understanding of the basic types of arbitrability issues in mind, we return to Attix's challenge to the scope of the parties' delegation agreement. Attix interprets the parties' express delegation clause to provide for a "partial" delegation of questions of arbitrability. In Attix's reading, the delegation clause has two main parts: an initial phrase delegating questions of arbitrability to an arbitrator, and a qualifying phrase limiting that delegation's scope. First, the initial phrase: "The arbitrator shall also decide what is subject to arbitration." On its face, this phrase would appear to commit any and all questions of arbitrability to an arbitrator's review. Attix does not assert that it does not, at least in isolation. Instead, Attix argues that the second part of the delegation clause—"unless prohibited by law"—qualifies the scope of the first part's delegation, pulling certain arbitrability issues back into the court's purview.

---

[10] The types of arbitrability questions we have identified do not represent an exhaustive list. For example, the availability of class proceedings in arbitration is yet another type of threshold arbitrability issue. *See JPay*, 904 F.3d at 927 (stating that "the availability of class arbitration" is "the kind of gateway question that determines the type of dispute that will be arbitrated"). We intend only to set out the major distinctions among types of arbitrability questions as applicable to this appeal.

And how exactly does Attix think that the second part of the delegation clause qualifies the delegation?  By reserving, he says, questions about whether the arbitration of his claims is "prohibited by law"—in other words, questions about whether the parties' agreement to arbitrate his claims is *unenforceable*—for judicial review.  Under Attix's reading of the delegation clause, threshold issues about the *scope* of the parties' agreement to arbitrate his claims, or about whether that agreement *applies* to a particular dispute, would presumably go to an arbitrator, under the first part of the clause providing that an "arbitrator shall also decide what is subject to arbitration."  But threshold issues about whether the parties' arbitration agreement is *enforceable* would be allocated to judicial review, under the "unless prohibited by law" language in the second part of the clause.  Thus, Attix asks the Court to conclude that most questions of arbitrability are delegated under the delegation clause, but any arbitrability dispute of the form "Law X makes the arbitration agreement unenforceable" is a question for the court.

Were we to adopt Attix's reading of the parties' delegation clause, we agree with Attix about what would follow: the delegation clause would function as a "partial" delegation sending most questions of arbitrability to an arbitrator, but *not* questions about enforceability, such as the parties' dispute about whether the Dodd-Frank Act renders their agreement to arbitrate Attix's claims unenforceable.  That dispute would be for the court to decide.

However, we do not adopt Attix's reading of the delegation clause. The plain and natural reading of the clause is that *all* questions of arbitrability are delegated to an arbitrator—including questions about whether the parties' arbitration agreement is enforceable—unless the law prohibits *the delegation of threshold arbitrability issues itself.* *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (noting that, when interpreting an arbitration agreement, we rely on "the plain text of the contract"). Unlike Attix, we do not interpret the parties' delegation clause as carving out certain arbitrability issues from the arbitrator's domain. When it directs that an "arbitrator shall also decide what is subject to arbitration," we find that the delegation clause sends all questions of arbitrability to an arbitrator without limitation. And what about the clause's "unless prohibited by law" language? That phrase imposes an unremarkable condition on the parties' otherwise-unqualified agreement to delegate questions of arbitrability: *i.e.*, simply that delegation will not occur if the law says it cannot.

This plain and natural reading of the parties' delegation clause—that all questions of arbitrability are delegated to an arbitrator, unless the law prohibits *that delegation*—aligns with ordinary rules of grammar. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482 (2021) ("[W]hen it comes to discerning the ordinary meaning of words, there are perhaps few better places to start than rules governing their usage."). Consider the word "unless" in the delegation clause—which, again for reference, states that "[t]he arbitrator shall also decide what is subject to arbitration unless

prohibited by law." "Unless" is a subordinating conjunction. *See The Chicago Manual of Style* ¶ 5.201 (17th ed. 2017). "A subordinating conjunction connects clauses of unequal grammatical rank," "introduc[ing] a clause that is dependent on the independent clause." *Id.* ¶ 5.200. The application of this basic rule to the delegation clause is commonplace and clear. In the parties' delegation clause, the independent clause is the complete sentence preceding the conjunction: "The arbitrator shall also decide what is subject to arbitration." The dependent clause is the fragment following the conjunction: "prohibited by law." And the conjunction connects the two, indicating that the event the first clause describes—the delegation of questions of arbitrability to an arbitrator—will occur "unless" the law prohibits it.

Attix's reading of the delegation clause, on the other hand— that questions of arbitrability are delegated to an arbitrator, unless the law prohibits *arbitration of the parties' claims*—is strained, odd, and contrary to the rules of grammar. Under Attix's reading of the delegation clause, "unless" would, it appears, connect the dependent phrase "prohibited by law" to only a single isolated word on the other side of the conjunction, "arbitration," chopping that word off from the rest of the clause in which it appears. Grammatically, that reading makes no sense. Thus, to make his interpretation of the delegation clause work, Attix has to subtly add extra words to it, so that, rather than provide that an "arbitrator shall also decide what is subject to arbitration unless prohibited by law," it would provide that an "arbitrator shall also decide what is

subject to arbitration unless *arbitration is* prohibited by law." But there is, of course, a much simpler way to make the delegation clause mean what Attix wants it to mean: by actually adding the words to the contract. If the parties had intended for an arbitrator to decide "what is subject to arbitration unless *arbitration is* prohibited by law," the delegation clause presumably would have simply said exactly that. Without the extra words, the clear and unmistakable meaning of the clause is the one we have laid out: all questions of arbitrability are delegated to an arbitrator, as long as the law does not prohibit the delegation of threshold arbitrability issues.[11]

Finally, we note that Attix's "partial delegation" interpretation of the parties' agreement, aside from being unnatural and contrary to the rules of grammar, conflicts with how

---

[11] Attix argues that, because there are two competing readings of the delegation clause, the clause is therefore ambiguous, and we should resolve the ambiguity in his favor. Because we require "clear and unmistakable evidence" that "the parties agreed to arbitrate arbitrability," *First Options of Chicago*, 514 U.S. at 944–45, if the parties' delegation clause were ambiguous, we would "presume that a court w[ould] decide arbitrability." *JPay*, 904 F.3d at 930.

But we find no ambiguity in the parties' delegation clause. "A contract term is ambiguous if reasonably susceptible to more than one interpretation." *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1360 (11th Cir. 1988) (quotation omitted). While Attix may interpret the delegation clause differently than we have, his reading is not reasonable. By its plain terms, the delegation clause commits all questions of arbitrability to an arbitrator's review.

delegation agreements typically work. We have noted that questions of arbitrability "are typically delegated or preserved as a group," and that both the Supreme Court and this Court have "spoken of questions of arbitrability as a unitary category." *JPay*, 904 F.3d at 943. We have not, to our knowledge, ever seen a "partial" delegation agreement in the wild. Nor does Attix say that he has, or cite any examples. That is not to say, of course, that a "partial" delegation agreement could not exist. Parties may structure their arbitration agreements as they like. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (noting that "[p]arties may generally shape [arbitration] agreements to their liking by specifying," among other things, "the issues subject to arbitration"). If parties wish to structure their contracts to delegate some questions of arbitrability to an arbitrator but not others, they are free to do so. But the parties in this case did not. This appeal involves a garden-variety delegation agreement committing all questions of arbitrability to an arbitrator's review. Thus, the arbitrability dispute in this case—*i.e.*, whether the parties' agreement to arbitrate Attix's claims is enforceable under the Dodd-Frank Act—is a question for the arbitrator.

## B.   Attix Has Not Specifically Challenged the Enforceability of the Delegation Agreement

We next consider whether Attix has specifically challenged the enforceability of the parties' delegation agreement. We find that he has not. When, as here, a contract contains a delegation agreement, challenges to the validity or enforceability of the

parties' separate agreement to arbitrate the merits of their claims are committed to an arbitrator's review. Thus, to overcome a delegation agreement, a party must challenge the validity or enforceability of the parties' precise agreement to arbitrate threshold arbitrability issues. Attix claims that he has specifically challenged the parties' delegation agreement. In his statutory challenge based on the Dodd-Frank Act, however, Attix disputes only the enforceability of the parties' agreement to arbitrate his claims arising from his use of Speedpay's service. And the enforceability of *that* agreement is, under the parties' separate delegation agreement, a threshold issue for an arbitrator to decide.

We begin by setting out the legal principles governing the interplay between what we will call "primary" arbitration agreements—*i.e.*, agreements to arbitrate the merits of claims arising from a contract—and delegation agreements. Recall that § 2 of the FAA says written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under § 2, a party may challenge an arbitration agreement's validity or enforceability based on "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center*, 561 U.S. at 68 (quotation omitted). Or, a party may challenge an arbitration agreement's enforceability by asserting that a federal statute outside the FAA precludes arbitration. *See, e.g.*, *Gilmer*, 500 U.S. at 27–35 (considering a challenge to the enforceability of an arbitration agreement under the ADEA); *Epic*

*Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623–27 (2018) (evaluating whether the National Labor Relations Act prohibited enforcement of class action waivers in certain arbitration agreements); *see also CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (noting that "the FAA's mandate" may be "overridden by a contrary congressional command" (quotation omitted)).  When the parties' contract includes no delegation agreement, the operation of these rules is fairly straightforward: the court simply decides whether there is either a generally applicable contract defense or a federal statute outside the FAA that makes the parties' agreement to arbitrate their claims invalid or unenforceable.  *See, e.g.*, *Bess v. Check Express*, 294 F.3d 1298, 1306–09 (11th Cir. 2002) (analyzing whether an arbitration agreement was unconscionable, and therefore unenforceable, under Alabama law).

When the parties' contract includes a delegation agreement, the situation is different.  A delegation agreement commits questions of arbitrability to an arbitrator's review, including questions about the validity or enforceability of the parties' primary arbitration agreement.  *See, e.g.*, *JPay*, 904 F.3d at 942–43 (noting that, by incorporating the AAA's delegation rules into their agreement, parties thereby agreed to arbitrate questions about the validity or enforceability of their agreement to arbitrate their claims (citing *Terminix*, 432 F.3d at 1329)).  Courts enforce agreements to arbitrate the validity or enforceability of primary arbitration agreements as a matter of common contractual sense.  "[W]here the parties have unambiguously agreed to arbitrate

gateway questions, they are entitled to have the arbitrator resolve those questions." *Jones*, 866 F.3d at 1270–71.

But, there is another wrinkle. An agreement to arbitrate questions about the validity or enforceability of a primary arbitration agreement *is itself* an arbitration agreement. *See Rent-A-Center*, 561 U.S. at 69 (noting that a delegation agreement "is simply an additional, antecedent agreement . . . and the FAA operates on this additional arbitration agreement just as it does on any other"). It is an agreement to arbitrate the arbitrability of the parties' claims, nested within another agreement to arbitrate the merits of those claims. *See Henry Schein*, 139 S. Ct. at 529. For the purpose of assessing its validity or enforceability, a delegation agreement is "severable" from the primary arbitration agreement in which it is contained. *See New Prime*, 139 S. Ct. at 538 (stating that, "under the severability principle, we treat a challenge to the validity of . . . a delegation clause . . . separately from a challenge to the validity of the entire contract in which it appears"); *see also Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1334 (11th Cir. 2016) ("Delegation clauses are severable from the underlying agreement to arbitrate."). And while, under the delegation agreement, challenges to the primary arbitration agreement's validity or enforceability are off-limits to the courts, *see JPay*, 904 F.3d at 942–43, a court must always consider a validity or enforceability challenge that is "specific" to the delegation agreement before enforcing it. *See Rent-A-Center*, 561 U.S. at 70–71 (noting that "a party's challenge to another provision of the

contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate" threshold arbitrability issues, but that, "[i]f a party challenges the validity under § 2 [of the FAA] of the precise [delegation] agreement . . . the federal court must consider the challenge before ordering compliance with that agreement").

Thus, in line with the Supreme Court's precedents, we have stated the following rule:

> [W]here an arbitration agreement contains a delegation provision—committing to the arbitrator the threshold determination of whether the agreement to arbitrate is enforceable—the courts only retain jurisdiction to review a challenge to that specific provision.

*Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144 (11th Cir. 2015); *see also Parm*, 835 F.3d at 1334–35 (noting that, when an arbitration agreement "contains a delegation clause, our review is limited, at least initially, to . . . direct challenges to that clause"). Under this rule, if a party successfully challenges the validity or enforceability of a delegation agreement, the court should proceed to resolve any challenges to the validity or enforceability of the parties' primary arbitration agreement, per the default rule assigning threshold arbitrability issues to the court's review. *See Parm*, 835 F.3d at 1335 (noting that, "if we determine that the delegation clause is itself invalid or unenforceable," we "may . . . review the enforceability of the arbitration agreement as a whole"); *U.S. Nutraceuticals*, 769

F.3d at 1311 ("[O]rdinarily, the question of arbitrability is undeniably an issue for judicial determination." (quotation omitted and alteration adopted)).  But if the court finds that the challenge to the validity or enforceability of the delegation agreement lacks merit—or if no such challenge is made—the court must enforce the delegation agreement and send any challenges to the validity or enforceability of the primary arbitration agreement to the arbitrator.  *See Parnell*, 804 F.3d at 1146–47 ("[A]bsent a challenge to the delegation provision itself, the federal courts must treat the delegation provision as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [a]greement as a whole for the arbitrator." (quotation omitted)).

Further, before deciding a challenge to the validity or enforceability of a delegation agreement, we should ensure that the challenge asserted *really is* about the delegation agreement.  Otherwise, we risk trampling on the parties' agreement to arbitrate the validity or enforceability of the other parts of the contract.  Accordingly, "[w]e may examine a challenge to a delegation provision only if the claimant challenged the delegation provision directly."  *Jones*, 866 F.3d at 1264 (quotation omitted); *see also Parnell*, 804 F.3d at 1146 ("[T]he plaintiff must challenge the delegation provision specifically." (quotation, alteration, and emphasis omitted)).  And to "directly" or "specifically" challenge the validity or enforceability of a delegation agreement, it is not sufficient for a party to merely say the words, "I am challenging the delegation agreement."  Challenging a delegation agreement is a

matter of substance, not form. A party specifically challenges the validity or enforceability of a delegation agreement if, and only if, the substantive nature of the party's challenge meaningfully goes to the parties' precise agreement to delegate threshold arbitrability issues. *See Rent-A-Center*, 561 U.S. at 71–72 (stating that "the basis of [a plaintiff's] challenge" to a delegation agreement must "be directed specifically" at the delegation agreement "before the court will intervene"); *see also id.* at 74 (petitioner did not directly challenge a delegation agreement where he "did not make any *arguments* specific to the delegation provision" (emphasis added)); *Jones*, 866 F.3d at 1265 (plaintiff "did not directly challenge the delegation provision" where he "d[id] not offer any details about why the delegation provision itself, apart from the agreement as a whole," was invalid or unenforceable, and where "the heart of his argumentation was directed at the agreement as a whole"); *Parnell*, 804 F.3d at 1146 (plaintiff did not directly challenge a delegation agreement where "he did not *articulate* a challenge to the delegation provision specifically" (emphasis added)).

And how, in practice, does a challenge to the validity or enforceability of a delegation agreement differ from a challenge only to the validity or enforceability of a primary arbitration agreement? Some examples may help to sharpen the distinction. *Rent-A-Center*, 561 U.S. 63, involved a challenge only to the validity or enforceability of a primary arbitration agreement. In *Rent-A-Center*, the plaintiff, Jackson, asserted discrimination claims against his former employer. *Id.* at 65. Jackson had executed

an arbitration agreement requiring arbitration of claims "arising out of" his employment with Rent-A-Center, including "claims for discrimination." *Id.* The arbitration agreement included a delegation clause stating that an arbitrator "shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation" of the arbitration agreement. *Id.* at 66.

After Jackson filed suit, Rent-A-Center moved to compel arbitration. *Id.* at 65–66. Jackson opposed arbitration, arguing that the parties' arbitration agreement was unconscionable, and therefore unenforceable, under Nevada law. *Id.* at 66. Jackson's unconscionability arguments were directed at two specific provisions of the parties' arbitration agreement: a provision requiring the parties to share the costs of arbitration, and a provision limiting the discovery available to the parties in arbitration. *See id.* at 74. Jackson argued that it would be unconscionable to require him to arbitrate his discrimination claims against Rent-A-Center under those conditions. *See id.*

The Supreme Court held that Jackson's unconscionability challenge went to the enforceability of the parties' arbitration agreement as a whole—but *not* specifically to the enforceability of the delegation clause—and that an arbitrator should therefore decide the unconscionability issue. *See id.* at 72–75. The Court noted that Jackson's specific unconscionability argument was that the arbitration agreement's cost-sharing and discovery-limiting procedures would result in an unfair arbitration of his

discrimination claims, and that the "*entire* Agreement" was therefore "invalid." *See id.* at 74 (emphasis in original). However, Jackson did not specifically assert that the threshold arbitration of his arbitrability challenge would be unfair as a result of those procedures. *See id.* (noting that Jackson had not "argue[d] that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable" (emphasis in original)). Because the substance of Jackson's unconscionability challenge was not "specific to the delegation provision," the Court enforced the delegation provision as written. *See id.* at 72, 74.

By contrast, *Parm*, 835 F.3d 1331, involved a specific challenge to the validity or enforceability of a delegation agreement. In *Parm*, the plaintiff asserted claims against National Bank of California (NBCal), a financial service provider of payday lender Western Sky, relating to allegedly illegal payday loan agreements between Western Sky and its borrowers. *Id.* at 1332–33. Parm's claims arose from her payday loan contract with Western Sky, in which she agreed to arbitrate "any controversy or claim between" Parm and Western Sky or its service providers. *See id.* at 1333. The arbitration agreement in the loan contract provided, with some inapplicable exceptions, that "any Dispute . . . will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules." *Id.* It included a delegation agreement in which Parm agreed to

arbitrate "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement." *Id.*

After Parm filed suit, NBCal moved to compel arbitration. *Id.* at 1334. Parm opposed arbitration, arguing that both her agreement to arbitrate her claims arising from her loan contract with Western Sky *and* her agreement to arbitrate threshold questions about the arbitrability of those claims were unenforceable because the arbitral forum provided for in the loan contract was illusory. *See id.* In particular, Parm argued that the Cheyenne River Sioux Tribal Nation does not arbitrate disputes and has no arbitration rules or procedures, and thus that there was no actual arbitral forum before which the parties could arbitrate any dispute. *See id.*

On appeal, we found that Parm had specifically challenged the enforceability of the loan contract's delegation agreement. *See id.* at 1334–35. Parm's challenge to the enforceability of the delegation agreement was simple and direct: because the parties' chosen arbitral forum did not exist, there was no one to whom the parties could delegate their threshold arbitrability issues. *See id.* at 1335 (discussing Parm's "contention . . . that the delegation clause is unenforceable because the arbitration agreement provides no available forum for an arbitrator to decide threshold issues of arbitrability"). Turning to the merits of Parm's challenge to the enforceability of the delegation agreement, we found that the Cheyenne River Sioux Tribal Nation was indeed an illusory arbitral forum and that the delegation agreement therefore could not be

enforced.[12]  *See id.* at 1335–37.  We then upheld Parm's challenge to the enforceability of the loan contract's primary arbitration agreement on similar grounds, finding that, given the illusory arbitral forum, Parm's agreement to arbitrate her claims could not be enforced either.  *See id.* at 1338.

Returning to the case at hand, to save this case from going to arbitration, Attix must raise a specific challenge to the validity or enforceability of the parties' delegation agreement.  *See Rent-A-Center*, 561 U.S. at 72 (stating that, "unless [the plaintiff has] challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4").  Attix has not done so.  The parties' delegation agreement says an arbitrator should decide questions of arbitrability, and Attix cites no law that would prohibit an arbitrator from doing so.  Attix argues that his statutory challenge based on the Dodd-Frank Act is "specific" to the parties' delegation agreement.  But it is not.  Attix's statutory challenge is only about whether the parties' primary arbitration agreement—*i.e.,* their agreement to arbitrate his claims—is

---

[12] In reaching this conclusion, we noted in *Parm* that § 5 of the FAA typically allows the court to "appoint a substitute in the event there is a lapse or failure of the named [arbitral] forum" in the parties' contract.  835 F.3d at 1337; *see also* 9 U.S.C. § 5.  But, because the parties' "'choice of forum [was] an integral part of the agreement to arbitrate,'" we held, in keeping with our prior precedents, that the "'failure of the chosen forum preclude[d] arbitration'" altogether.  *Parm*, 835 F.3d at 1337 (quoting *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1350 (11th Cir. 2014)).

44                 Opinion of the Court                 20-13575

enforceable. Under the parties' delegation agreement, that issue is committed to an arbitrator's review.

To understand why Attix's Dodd-Frank Act challenge is only about whether the parties' *primary* arbitration agreement is enforceable, not whether the parties' *delegation* agreement is enforceable, we must understand the nature of the challenge. Attix bases his Dodd-Frank Act challenge on 15 U.S.C. § 1639c(e)(3), which states:

> No provision of any residential mortgage loan or of any extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer, and *no other agreement between the consumer and the creditor relating to the residential mortgage loan* or extension of credit referred to in paragraph (1), *shall be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States*, or any other court of competent jurisdiction, pursuant to section 1640 of this title or any other provision of law, for damages or other relief in connection with any alleged violation of this section, any other provision of this subchapter, or any other Federal law.

15 U.S.C. § 1639c(e)(3) (emphases added).

Attix's Dodd-Frank Act challenge has two parts. The first part is about the types of agreements that fall within § 1639c(e)(3)'s purview. Section 1639c(e)(3) governs several types of agreements, including an "agreement between [a] consumer and [a] creditor

relating to [a] residential mortgage loan." Attix argues that the Speedpay terms and conditions are one such mortgage-related agreement between a consumer and a creditor. In particular, Attix argues that, under the statute: (1) he is a "consumer"; (2) Carrington is a "creditor"; and (3) the terms and conditions governing his use of Speedpay's service to pay his mortgage in May 2020 "relate to" his residential mortgage loan.

The second part of Attix's Dodd-Frank Act challenge is about § 1639c(e)(3)'s protections against arbitration. Section 1639c(e)(3) provides that a mortgage-related contract between a consumer and a creditor "shall [not] be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States . . . for damages or other relief in connection with any alleged violation of this section, any other provision of this subchapter, or any other Federal law." Attix argues that, because his claims arise from the Speedpay terms and conditions, and because he has asserted a claim against Carrington under a "[f]ederal law," *i.e.*, the FDCPA, this provision guarantees him the right to bring his claims against Carrington in federal court. Therefore, Attix says, the statute renders his agreement to arbitrate his claims unenforceable, because to enforce the arbitration agreement would be to "interpret" and "apply" the Speedpay terms

and conditions "so as to bar" him from pursuing his claims in court.[13]

Attix's Dodd-Frank Act challenge is, without doubt, about the enforceability of the parties' primary arbitration agreement—*i.e.,* their agreement that "any dispute arising from or relating to Service or your Payment(s) shall be resolved by mandatory and binding arbitration." Indeed, in his brief, Attix describes his Dodd-Frank Act challenge by reference to the parties' agreement to arbitrate his claims, stating, for example, that "the Dodd-Frank Act prohibits arbitration of plaintiff's claims relating to plaintiff's mortgage," and that "Section 1639c(e)(3) of the Dodd-Frank Act prohibits Carrington . . . from compelling arbitration of . . . causes of action relating to Plaintiff's residential mortgage loan." These descriptions are correct. By arguing that § 1639c(e)(3) gives him the right to prosecute his claims against Carrington in federal court, Attix is disputing the enforceability of the parties' primary arbitration agreement.

---

[13] In response to Attix's Dodd-Frank Act challenge, Carrington does not dispute that § 1639c(e)(3) protects against the arbitration of claims arising from certain agreements. Rather, Carrington argues that the Speedpay terms and conditions fall outside of § 1639c(e)(3)'s ambit altogether. In particular, Carrington argues that, under the statute: (1) it is not a "creditor"; and (2) the Speedpay terms and conditions do not "relate to" Attix's residential mortgage loan. Thus, Carrington argues, its agreement with Attix is not an "agreement between [a] consumer and [a] creditor relating to [a] residential mortgage loan" to which § 1639c(e)(3)'s protections against arbitration would apply.

Attix's Dodd-Frank Act challenge is *not*, however, about the enforceability of the parties' delegation agreement.  The parties' express delegation clause provides that an "arbitrator shall also decide what is subject to arbitration unless prohibited by law," and the AAA rules the parties incorporated into their agreement provide that an "arbitrator shall have the power to rule on his or her own jurisdiction."    These provisions commit threshold arbitrability issues to an arbitrator's review.  The parties have a live threshold dispute: whether their agreement to arbitrate Attix's claims falls within the scope of § 1639c(e)(3)'s protections against arbitration.  And—this is the critical part—*Attix does not explain how § 1639c(e)(3) bars an arbitrator from resolving that dispute.*  Although Attix asserts that the Speedpay terms and conditions fall within § 1639c(e)(3)'s purview, he points to no language in § 1639c(e)(3) that says a court, rather than an arbitrator, must decide whether he is right.  *See Parnell*, 804 F.3d at 1149 (plaintiff did not specifically challenge a delegation agreement where "[a]t no point in his complaint [did he] specifically challenge the parties' agreement *to commit to arbitration* the question of the enforceability of the arbitration agreement" (emphasis in original)).  By contract, the gateway question of arbitrability in this case is delegated to an arbitrator, and nothing in § 1639c(e)(3) divests the arbitrator of his or her power to decide that issue.

Further, in unpacking why § 1639c(e)(3) does not bar the delegation of questions of arbitrability, one passage in the statute warrants particular attention: the prohibition against certain

mortgage-related agreements being "applied or interpreted so as to bar a consumer from bringing an action" in federal court. 15 U.S.C. § 1639c(e)(3). We read this language to provide that arbitration agreements in contracts that fall into a particular bucket—*i.e.,* the "mortgage-related contracts between consumers and creditors" bucket—are unenforceable. We do not, however, read it to bar an arbitrator from deciding whether a given contract falls into that bucket to begin with. In other words, we do not read § 1639c(e)(3) to prohibit the enforcement of delegation agreements in any way.

After all, how would one "appl[y]" or "interpret[]" a contract so as to "bar" an "action" in federal court? We think the answer is obvious: by enforcing an agreement to arbitrate claims arising from the contract. The parties' delegation agreement, however—unlike their primary arbitration agreement—is *not* an agreement to arbitrate their claims. It is simply an agreement to have an arbitrator decide threshold issues of arbitrability. Whether § 1639c(e)(3) even applies to the parties' contract at all is a quintessential arbitrability question. The parties have agreed that an arbitrator will decide that question, and nothing in § 1639c(e)(3) requires that a court decide the question instead.

To sharpen the point even more, consider a contrasting hypothetical. Imagine that § 1639c(e)(3) said something like the following:

> No agreement between a consumer and a creditor relating to a residential mortgage loan shall be applied or interpreted so as to bar a consumer from bringing

> an action in an appropriate district court of the United States arising from that agreement and asserted under any Federal law. *Any controversy regarding whether a particular contract constitutes an agreement falling within the scope of this subsection shall be determined by an appropriate district court of the United States.*

Under a provision like this, Attix would, or at least might, have a cognizable challenge to the enforceability of a delegation agreement committing threshold arbitrability issues—including whether a particular contract falls within § 1639c(e)(3)'s purview—to an arbitrator's review. By providing that a federal court must determine "whether a particular contract constitutes an agreement falling within the scope" of the statute, this hypothetical provision would appear to prohibit an arbitrator from deciding that threshold issue.[14] But these are made-up words. They are not in the statute. The actual statute is silent as to *who* may decide whether a particular contract falls within the scope of its protections. And, of course, the parties' agreement is *not* silent as to who should decide.

Finally, Attix suggests that we have "jurisdiction" to consider his Dodd-Frank Act challenge because, in the district court, Attix asserted a *different* challenge to the validity or enforceability of the delegation agreement: *i.e.*, that Carrington

---

[14] To be clear, we are not suggesting that this pretend statute should or even could exist. We are not in the business of writing statutes, and disclaim any expertise in that art. We offer the example solely for purposes of illustration.

was not a party to the Speedpay terms and conditions and therefore could not enforce the delegation agreement. The district court rejected this "Carrington was not a party" argument, and Attix has not raised it on appeal. Attix argues, however, that, because he made one argument that was "specific" to the delegation agreement below, we can consider other arguments he has made on appeal whether or not they relate specifically to the delegation agreement. That is not how this works. When a contract contains a delegation agreement, "we only retain jurisdiction to review a challenge to that particular provision." *Parnell*, 804 F.3d at 1148.[15] The fact that Attix made one argument in the district court that may have been specifically about the validity or enforceability of the parties' delegation agreement does not open the door for us to consider other challenges that are not. *See Parm*, 835 F.3d at 1334–35 (when an arbitration agreement "contains a delegation clause, our review is limited" to "direct challenges to that clause").

Because Attix's Dodd-Frank Act challenge is only about the enforceability of the parties' primary arbitration agreement, under the parties' delegation agreement, an arbitrator must resolve it. *See Bodine v. Cook's Pest Control Inc.*, 830 F.3d 1320, 1324 (11th Cir. 2016) ("When a delegation clause is properly raised by the

---

[15] We note, as we have said before, that our reference to "jurisdiction" in *Parnell* was not a reference to "'jurisdiction' in its technical sense." *Bodine v. Cook's Pest Control Inc.*, 830 F.3d 1320, 1324 n.3 (11th Cir. 2016). We meant only to "convey that whether the arbitration agreement was enforceable was a decision committed not to the court, but to the arbitrator." *Id.*

defendant and never specifically challenged by the plaintiff, the FAA directs the court to treat the clause as valid and compel arbitration."). If the arbitrator decides that the Speedpay terms and conditions are an "agreement between [a] consumer and [a] creditor relating to [a] residential mortgage loan" under § 1639c(e)(3), and that § 1639c(e)(3) guarantees Attix a right to assert his claims arising from that agreement in federal court, Attix's action will return to court for judicial determination of his claims. If the arbitrator determines that the Speedpay terms and conditions fall outside of § 1639c(e)(3)'s ambit, Attix's action will proceed in arbitration, under the terms of the parties' agreement. To be clear, we take no position whatsoever on the proper interpretation of any provision of § 1639c(e)(3), or its applicability, or lack thereof, to this case. We leave those determinations to an arbitrator, because that is what the parties have agreed.

*    *    *

As those keeping score at home will have already realized, here is what we do not decide in this appeal: We do not decide whether Attix's claims have merit. Nor do we decide whether the parties must arbitrate Attix's claims. Instead, we decide only who will decide whether the parties must arbitrate. Under the parties' agreement, the answer is, an arbitrator.

At the end of the day, the "arbitrability of arbitrability" is simply about the freedom to decide *who* decides disputes. Federal law provides, emphatically, that parties may opt out of the judicial

system.  One would be hard-pressed to find a topic about which the Supreme Court has provided more consistent clarity in recent years than arbitration.  The Court's precedents make clear that, when an appeal presents a delegation agreement and a question of arbitrability, we stop.  We do not pass go.  At some point in this litigation, someone may, perhaps, collect $200.  Whether anyone will—and who will ultimately decide whether anyone does—are not questions we answer today.

## IV.  Conclusion

We **REVERSE** the denial of Carrington's motion to compel arbitration and **REMAND** to the district court with instructions to compel arbitration and stay the proceedings in the district court.